# DEL MONTE MINING AND MILLING COMPANY *v.* LAST CHANCE MINING AND MILLING COMPANY.

CERTIFICATE FROM THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 147.  Argued December 8, 9, 1897. — Decided May 23, 1898.

To the first question certified by the Circuit Court of Appeals, viz.: " 1. May any of the lines of a junior lode location be laid within, upon or across the surface of a valid senior location for the purpose of defining for or securing to such junior location under-ground or extralateral rights not in conflict with any rights of the senior location ? " this court returns an affirmative answer, subject to the qualification that no forcible entry is made.

It passes the second question, viz. : " 2. Does the patent of the Last Chance Lode mining claim, which first describes the rectangular claim by metes and bounds and then excepts and excludes them from the premises previously granted to the New York Lode mining claim, convey to the patentee anything more than he would take by a grant specifically describing only the two irregular tracts which constitute the granted surface of the Last Chance claim ? " because it needs no other answer than that which is contained in the discussion of the first question in its opinion.

To the third question, viz.: " 3. Is the easterly side of the New York Lode mining claim and ' end line' of the Last Chance Lode mining claim within the meaning of sections 2320 and 2322 of the Revised Statutes of the United States ? " it gives a negative answer.

The fourth question, viz.: " 4. If the apex of a vein crosses one end line and one side line of a lode mining claim, as located thereon, can the locator of such vein follow it upon its dip beyond the vertical side line of his location ? " it answers in the affirmative.

It holds that the fifth question, viz.: " 5. On the facts presented by the record herein has the appellee the right to follow its vein downward beyond its west side line and under the surface of the premises of appellant ? " in effect seeks from this court a decision of the whole case, and therefore is not one which it is called upon to answer.

In discussing the first of these questions the court holds :

(1) That it is dealing with statutory rights, and may not go beyond the terms of the statutes ;

(2) That as Congress has prescribed the conditions upon which extralateral rights may be acquired, a party must bring himself within those conditions, or else be content with simply the mineral beneath the surface of his own territory ;

(3) That the Government does not grant the right to search for minerals in lands which are the private property of individuals, or authorize any disturbance of the title or possession of such lands ;

(4) That the location of a mining claim means the giving notice of that claim : that it need not follow the lines of Government surveys : that it is made to measure rights beneath the surface : and that although the statute requires it to be distinctly marked on the surface, the doing so does not prevent a subsequent location by another party upon the same, or a part of the same territory, as, in such case, the statute provides a way for determining the respective rights of the parties :

(5) That the requisition in the statute that the end lines of the location should be parallel was for the purpose of bounding the underground extralateral rights which the owner of the location might exercise.

(6) That the answer to the first question does not involve a decision as to the full extent of the rights beneath the surface which the junior locator acquires.

In discussing the fourth of these propositions the court says : " Our conclu-

sions may be summed up in these propositions: *First*, the location as made on the surface by the locator determines the extent of rights below the surface. *Second*, the end lines, as he marks them on the surface, with the single exception hereinafter noticed, place the limits beyond which he may not go in the appropriation of any vein or veins along their course or strike. *Third*, every vein ' the top or apex of which lies inside of such surface lines extended downward vertically' becomes his by virtue of his location, and he may pursue it to any depth beyond his vertical side lines, although in so doing he enters beneath the surface of some other proprietor. *Fourth*, the only exception to the rule that the end lines of the location as the locator places them establish the limits beyond which he may not go in the appropriation of a vein on its course or strike is where it is developed that in fact the location has been placed not along but across the course of the vein. In such case the law declares that those which the locator called his side lines are his end lines, and those which he called end lines are in fact side lines, and this upon the proposition that it was the intent of Congress to give to the locator only so many feet of the length of the vein, that length to be bounded by the lines which the locator has established of his location.

THIS case is before this court on questions certified by the Court of Appeals for the Eighth Circuit. The facts stated are as follows: The appellant is the owner in fee of the Del Monte Lode mining claim, located in the Sunnyside mining district, Mineral County, Colorado, for which it holds a patent bearing date February 3, 1894, pursuant to an entry made at the local land office on February 27, 1893. The appellee is the owner of the Last Chance Lode mining claim, under patent dated July 5, 1894, based on an entry of March 1, 1894. The New York Lode mining claim, which is not owned by either of the parties, was patented on April 5, 1894, upon an entry of August 26, 1893. The relative situation of these claims, as well as the course and dip of the vein, which is the subject of controversy, is shown in the diagram on page 58.

Both in location and patent the Del Monte claim is first in time, the New York second and the Last Chance third. When the owners of the Last Chance claim applied for their patent proceedings in adverse were instituted against them by the owners of the New York claim, and an action in support of such adverse was brought in the United States Circuit Court for the District of Colorado. This action terminated

in favor of the owners of the New York and against the owners of the Last Chance, and awarded the territory in conflict between the two locations to the New York claim. The ground in conflict between the New York and Del Monte, except so much thereof as was also in conflict between the

Scale, 400 ft = 1 inch

Del Monte and Last Chance locations, is included in the patent to the Del Monte claim. The New York secured a patent to all its territory, except that in conflict with the Del Monte, and the Last Chance in turn secured a patent to all of its territory, except that in conflict with the New York, in which last-named patent was included the triangular sur-

face conflict between the Del Monte and Last Chance, which, by agreement, was patented to the latter.   The Last Chance claim was located upon a vein, lode or ledge of silver and lead bearing ore, which crosses its north end line and continues southerly from that point through the Last Chance location until it reaches the eastern side line of the New York, into which latter territory it enters, continuing thence southerly with a southeasterly course on the New York claim until it crosses its south end line.   No part of the apex of the vein is embraced within the small triangular parcel of ground in the southwest corner of the Last Chance location which was patented to the Last Chance as aforesaid, and no part of the apex is within the surface boundaries of the Del Monte mining claim.   The portion of the vein in controversy is that lying under the surface of the Del Monte claim and between two vertical planes, one drawn through the north end line of the Last Chance claim extending westerly, and the other parallel thereto and starting at the point where the vein leaves the Last Chance and enters the New York claim, as shown on the foregoing diagram.   Upon these facts the following questions have been certified to us:

"1. May any of the lines of a junior lode location be laid within, upon or across the surface of a valid senior location for the purpose of defining for or securing to such junior location under-ground or extralateral rights not in conflict with any rights of the senior location?

"2. Does the patent of the Last Chance Lode mining claim, which first describes the rectangular claim by metes and bounds and then excepts and excludes therefrom the premises previously granted to the New York Lode mining claim, convey to the patentee anything more than he would take by a grant specifically describing only the two irregular tracts which constitute the granted surface of the Last Chance claim?

"3. Is the easterly side of the New York Lode mining claim an 'end line' of the Last Chance Lode mining claim within the meaning of sections 2320 and 2322 of the Revised Statutes of the United States?

" 4. If the apex of a vein crosses one end line and one side line of a lode mining claim, as located thereon, can the locator of such vein follow it upon its dip beyond the vertical side line of his location ?

" 5. On the facts presented by the record herein has the appellee the right to follow its vein downward beyond its west side line and under the surface of the premises of appellant ? "

*Mr. Charles S. Thomas* for Del Monte Mining & Milling Company. *Mr. William H. Bryant* and *Mr. Harry H. Lee* were on his brief.

*Mr. Joel F. Vaile* for Last Chance Mining & Milling Company. *Mr. Edward O. Wolcott* was on his brief.

MR. JUSTICE BREWER, after stating the case, delivered the opinion of the court.

The questions thus presented are not only important but difficult, involving as they do the construction of the statutes of the United States in respect to mining claims. As leading up to a clearer understanding of those statutes it may be well to notice the law in existence prior thereto. The general rule of the common law was that whoever had the fee of the soil owned all below the surface, and this common law is the general law of the States and Territories of the United States, and, in the absence of specific statutory provisions or contracts, the simple inquiry as to the extent of mining rights would be, who owns the surface. Unquestionably at common law the owner of the soil might convey his interest in mineral beneath the surface without relinquishing his title to the surface, but the possible fact of a separation between the ownership of the surface and the ownership of mines beneath that surface, growing out of contract, in no manner abridged the general proposition that the owner of the surface owned all beneath. It is said by Lindley, in his work on Mines, (vol. 1, sec. 4,) that in certain parts of England and Wales so called

local customs were recognized which modified the general rule of the common law, but the existence of such exceptions founded upon such local customs only accentuates the general rule. The Spanish and Mexican mining law confined the owner of a mine to perpendicular lines on every side. *Mining Company* v. *Tarbet,* 98 U. S. 463, 468 ; 1 Lindley on Mines, sec. 13. The peculiarities of the Mexican law are discussed by Lindley at some length in the section referred to. It is enough here to notice the fact that by the Mexican as by the common law the surface rights limited the rights below the surface.

In the acquisition of foreign territory since the establishment of this government the great body of the land acquired became the property of the United States, and is known as their " public lands." By virtue of this ownership of the soil the title to all mines and minerals beneath the surface was also vested in the Government. For nearly a century there was practically no legislation on the part of Congress for the disposal of mines or mineral lands. The statute of July 26, 1866, c. 262, 14 Stat. 251, was the first general statute providing for the conveyance of mines or minerals. Previous to that time it is true that there had been legislation respecting leases of mines, as, for instance, the act of March 3, 1807, c. 49, § 5, 2 Stat. 448, 449, which authorized the President to lease any lead mine in the Indiana Territory for a term not exceeding five years ; and acts providing for the sale of lands containing lead mines in special districts, act of March 3, 1829, c. 55, 4 Stat. 364; act of July 11, 1846, c. 36, 9 Stat. 37; act of March 1, 1847, c. 32, 9 Stat. 146 ; act of March 3, 1847, c. 54, 9 Stat. 179 ; also such legislation as is found in the act of February 27, 1865, c. 64, 13 Stat. 440, providing for a District and Circuit Court for the District of Nevada; in which it was said, in section 9 : " That no possessory action between individuals in any of the courts of the United States for the recovery of any mining title, or for damages to any such title, shall be affected by the fact that the paramount title to the land on which such mines are, is in the United States, but each case shall be adjudged by the law of posses-

sion;" that of May 5, 1866, c. 73, 14 Stat. 43, concerning the boundaries of the State of Nevada, which provided that "all possessory rights acquired by citizens of the United States to mining claims, discovered, located and originally recorded in compliance with the rules and regulations adopted by miners in the Pah-Ranagat and other mining districts in the territory incorporated by the provisions of this act into the State of Nevada shall remain as valid subsisting mining claims; but nothing herein contained shall be so construed as granting a title in fee to any mineral lands held by possessory titles in the mining States and Territories;" and the act of July 25, 1866, c. 244, 14 Stat. 242, which, granting to A. Sutro and his assigns certain privileges to aid in the construction of a tunnel, conferred upon the grantees the right of preëmption of lodes within two thousand feet on each side of said tunnel. Two laws were also passed regulating the sale and disposal of coal lands; one on July 1, 1864, c. 205, and one on March 3, 1865, c. 107, 13 Stat. 343, 529.

Notwithstanding that there was no general legislation on the part of Congress, the fact of explorers searching the public domain for mines, and their possessory rights to the mines by them discovered, was generally recognized, and the rules and customs of miners in any particular district were enforced as valid. As said by this court in *Sparrow* v. *Strong*, 3 Wall. 97, 104: "We know, also, that the territorial legislature has recognized by statute the validity and binding force of the rules, regulations and customs of the mining districts. And we cannot shut our eyes to the public history, which informs us that under this legislation, and not only without interference by the National Government, but under its implied sanction, vast mining interests have grown up, employing many millions of capital, and contributing largely to the prosperity and improvement of the whole country." See also *Forbes* v. *Gracey*, 94 U. S. 762; *Jennison* v. *Kirk*, 98 U. S. 453, 459; *Broder* v. *Water Company*, 101 U. S. 274, 276; *Manuel* v. *Wulff*, 152 U. S. 505, 510; *Black* v. *Elkhorn Mining Company*, 163 U. S. 445, 449.

The act of 1866 was, however, as we have said, the first

general legislation in respect to the disposal of mines. The first section provided: "That the mineral lands of the public domain, both surveyed and unsurveyed, are hereby declared to be free and open to exploration and occupation by all citizens of the United States, and those who have declared their intention to become citizens, subject to such regulations as may be prescribed by law, and subject also to the local customs or rules of miners in the several mining districts, so far as the same may not be in conflict with the laws of the United States."

The second section gave to a claimant of a vein or lode of quartz, or other rock in place, bearing gold, etc., the right "to file in the local land office a diagram of the same . . . and to enter such tract and receive a patent therefor, granting such mine, together with the right to follow such vein or lode with its dips, angles and variations, to any depth, although it may enter the land adjoining, which land adjoining shall be sold subject to this condition." The purpose here manifested was the conveyance of the vein, and not the conveyance of a certain area of land within which was a vein. Section 3, which set forth the steps necessary to be taken to secure a patent and required the payment of five dollars per acre for the land conveyed, added: "But said plat, survey or description shall in no case cover more than one vein or lode, and no patent shall issue for more than one vein or lode, which shall be expressed in the patent issued." Nowhere was there any express limitation as to the amount of land to be conveyed, the provision in section 4 being: "That no location hereafter made shall exceed two hundred feet in length along the vein for each locator, with an additional claim for discovery to the discoverer of the lode, with the right to follow such vein to any depth, with all its dips, variations and angles, together with a reasonable quantity of surface for the convenient working of the same as fixed by local rules: *And provided further*, That no person may make more than one location on the same lode, and not more than three thousand feet shall be taken in any one claim by any association of persons." Obviously the statute contemplated the patenting of a certain

number of feet of the particular vein claimed by the locator, no matter how irregular its course, made no provision as to the surface area or the form of the surface location, leaving the Land Department in each particular case to grant so much of the surface as was "fixed by local rules," or was in the absence of such rules in its judgment necessary for the convenient working of the mine. The party to whom the vein was thus patented was permitted to follow it on its dip to any extent, although thereby passing underneath lands to which the owner of the vein had no title.

As might be expected, the patents issued under this statute described surface areas very different and sometimes irregular in form. Often they were like a broom, there being around the discovery shaft an amount of ground deemed large enough for the convenient working of the mine, and a narrow strip extending therefrom as the handle of the broom. This strip might be straight or in a curved or irregular line, following, as was supposed, the course of the vein. Sometimes the surface claimed and patented was a tract of considerable size, so claimed with the view of including the apex of the vein, in whatever direction subsequent explorations might show it to run. And again, where there were local rules giving to the discoverer of a mine possessory rights in a certain area of surface, the patent followed those rules and conveyed a similar area. Even under this statute, although its express purpose was primarily to grant the single vein, yet the rights of the patentee beneath the surface were limited and controlled by his rights upon the surface. If, in fact, as shown by subsequent explorations, the vein on its course or strike departed from the boundary lines of the surface location, the point of departure was the limit of right. In other words, he was not entitled to the claimed and patented number of feet of the vein, irrespective of the question whether the vein in its course departed from the lines of the surface location.

The litigation in respect to the Flagstaff mine in Utah illustrates this. There was a local custom giving to the locator of a mine fifty feet in width on either side of the course of the vein, and the Flagstaff patent granted a super-

ficies one hundred feet wide by twenty-six hundred feet long, with the right to follow the vein described therein to the extent of twenty six hundred feet. It turned out that the vein, instead of running through this parallelogram lengthwise, crossed the side lines, so that there was really but a hundred feet of the length of the vein within the surface area. On either side of the Flagstaff ground were other locations, through which the vein on its course passed. As against these two locations the owners of the Flagstaff claimed the right to follow the vein on its course or strike to the full extent of twenty-six hundred feet. This was denied by the Supreme Court of Utah. *McCormick* v. *Varnes*, 2 Utah, 355. In that case the controversy was with the location on the west of the Flagstaff. The decision of that court in respect to the controversy with the location on the east of the Flagstaff is not reported, but the case came to this court. *Mining Company* v. *Tarbet*, 98 U. S. 463. In the course of the opinion (pages 467, 468) it was said:

" It was not the intent of the law to allow a person to make his location crosswise of a vein so that the side lines shall cross it, and thereby give him the right to follow the strike of the vein outside of his side lines. That would subvert the whole system sought to be established by the law. If he does locate his claim in that way, his rights must be subordinated to the rights of those who have properly located on the lode. Their right to follow the dip outside of their side lines cannot be interfered with by him. His right to the lode only extends to so much of the lode as his claim covers. If he has located crosswise of the lode, and his claim is only one hundred feet wide, that one hundred feet is all he has a right to."

These decisions show that while the express purpose of the statute was to grant the vein for so many feet along its course, yet such grant could only be made effective by a surface location covering the course to such extent. This act of 1866 remained in force only six years, and was then superseded by the act of May 10, 1872, c. 152, 17 Stat. 91, found in the Revised Statutes, sections 2319 and following. This is the statute which is in force to-day, and under which the con-

troversies in this case arise.    Section 2319, Revised Statutes,
(corresponding to section 1 of the act of 1872,) reads :

"All valuable mineral deposits in lands belonging to the
United States, both surveyed and unsurveyed, are hereby
declared to be free and open to exploration and purchase, and
the lands in which they are found to occupation and purchase,
by citizens of the United States and those who have declared
their intention to become such, under regulations prescribed
by law, and according to the local customs or rules of miners
in the several mining districts, so far as the same are appli-
cable and not inconsistent with the law of the United States."

It needs no argument to show that if this were the only
section bearing upon the question, patents for land containing
mineral would, except in cases affected by local customs and
rules of miners, be subject to the ordinary rules of the common
law, and would convey title to only such minerals as were
found beneath the surface.    We therefore turn to the follow-
ing sections to see what extralateral rights are given and upon
what conditions they may be exercised.    And it must be
borne in mind in considering the questions presented that we
are dealing simply with statutory rights.    There is no showing
of any local customs or rules affecting the rights defined in
and prescribed by the statute, and beyond the terms of the
statute courts may not go.    They have no power of legisla-
tion.    They cannot assume the existence of any natural equity
and rule that by reason of such equity a party may follow a
vein into the territory of his neighbor, and appropriate it to his
own use.  If cases arise for which Congress has made no pro-
vision, the courts cannot supply the defect.    Congress having
prescribed the conditions upon which extralateral rights may
be acquired, a party must bring himself within those condi-
tions or else be content with simply the mineral beneath the
surface of his territory.    It is undoubtedly true that the prim-
ary thought of the statute is the disposal of the mines and
minerals, and in the interpretation of the statute this primary
purpose must be recognized and given effect.    Hence, when-
ever a party has acquired the title to ground within whose sur-
face area is the apex of a vein with a few or many feet along

its course or strike, a right to follow that vein on its dip for the same length ought to be awarded to him if it can be done, and only if it can be done, under any fair and natural construction of the language of the statute. If the surface of the ground was everywhere level and veins constantly pursued a straight line there would be little difficulty in legislation to provide for all contingencies, but mineral is apt to be found in mountainous regions where great irregularity of surface exists and the course or strike of the veins is as irregular as the surface, so that many cases may arise in which statutory provisions will fail to secure to a discoverer of a vein such an amount thereof as equitably it would seem he ought to receive. We make these observations because we find in some of the opinions assertions by the writers that they have devised rules which will work out equitable solutions of all difficulties. Perhaps those rules may have all the virtues which are claimed for them, and if so it were well if Congress could be persuaded to enact them into statute; but be that as it may, the question in the courts is not, what is equity, but what saith the statute. Thus, for instance, there is no inherent necessity that the end lines of a mining claim should be parallel, yet the statute has so specifically prescribed. (Sec. 2320.) It is not within the province of the courts to ignore such provision and hold that a locator, failing to comply with its terms, has all the rights, extralateral and otherwise, which he would have been entitled to if he had complied, and so it has been adjudged. *Iron Silver Mining Company* v. *Elgin Mining Company*, 118 U. S. 196.

This case, which is often called the "Horseshoe case," on account of the form of the location, is instructive. The diagram on page 68, which was in the record in that case, illustrates the scope of the decision.

The locator claimed in his application for a patent the lines 1, 14 and 5, 6, as the end lines of his location, and because of their parallelism, that he had complied with the letter of the statute, but the court ruled against him, saying in the opinion (page 208):

"The exterior lines of the Stone claim formed a curved

figure somewhat in the shape of a horseshoe, and its end lines are not and cannot be made parallel. What are marked on the plat as end lines are not such. The one between numbers 5 and 6 is a side line. The draughtsman or surveyor seems to have hit upon two parallel lines of his nine-sided figure,

SCALE - 200 FEET = 1 INCH.

and apparently for no other reason than their parallelism called them end lines.

"We are, therefore, of opinion that the objection that, by reason of the surface form of the Stone claim, the defendant could not follow the lode existing therein in its downward course beyond the lines of the claim, was well taken to the offered proof."

It is true the court also observed that if the two lines named by the locator were to be considered the end lines, no part of the vein in controversy fell " within vertical planes drawn down through those lines, continued in their own direction." But notwithstanding this observation the point of the decision was that the lines, which were the end lines of the location as made on the surface of the ground, were not parallel, and that this defect could not be obviated by calling that which was in fact a side line an end line. This is made more clear by the observations of the Chief Justice, who, with Mr. Justice Bradley, dissented, in which he said :

" I cannot agree to this judgment. In my opinion the end lines of a mining location are to be projected parallel to each other and crosswise of the general course of the vein within the surface limits of the location, and whenever the top or apex of the vein is found within the surface lines extended vertically downwards, the vein may be followed outside of the vertical side lines. The end lines are not necessarily those which are marked on the map as such, but they may be projected at the extreme points where the apex leaves the location as marked on the surface."

In other words, the court took the location as made on the surface by the locator, determined from that what were the end lines, and made those surface end lines controlling upon his rights ; and rejected the contention that it was proper for the court to ignore the surface location and create for the locator a new location whose end lines should be crosswise of the general course of the vein as finally determined by explorations. That this decision and that in the *Tarbet case,* *supra,* were correct expositions of the statute and correctly comprehended the intent of Congress therein, is evident from the fact that, although they were announced in 1885 and 1878, respectively, Congress has not seen fit to change the language of the statute, or in any manner to indicate that any different measure of rights should be awarded to a mining locator.

With these preliminary observations we pass to a consideration of the questions propounded. The first is:

" May any of the lines of a junior lode location be laid

within, upon or across the surface of a valid senior location for the purpose of defining for or securing to such junior location underground or extralateral rights not in conflict with any rights of the senior location?"

By section 2319, quoted above, the mineral deposits which are declared to be open to exploration and purchase are those found in lands belonging to the United States, and such lands are the only ones open to occupation and purchase. While this is true, it is also true that until the legal title has passed the public lands are within the jurisdiction of the Land Department, and although equitable rights. may be established Congress retains a certain measure of control. *Michigan Land & Lumber Company* v. *Rust*, 168 U. S. 589. The grant is, as is often said, in process of administration. Passing to section 2320, beyond the recognition of the governing force of customs and regulations and a declaration as to the extreme length and width of a mining claim, it is provided that "no location of a mining claim shall be made until the discovery of the vein or lode within the limits of the claim located. . . . The end lines of each claim shall be parallel to each other."

Section 2322 gives to the locators of all mining locations, so long as they comply with laws of the United States, and with state, territorial and local regulations not in conflict therewith, "the exclusive right of possession and enjoyment of all the surface included within the lines of their locations, and of all veins, lodes and ledges throughout their entire depth, the top or apex of which lies inside of such surface lines extended downward vertically, although such veins, lodes or ledges may so far depart from a perpendicular in their course downward as· to extend outside the vertical side lines of such surface locations. But their right of possession to such outside parts of such veins or ledges shall be confined to such portions thereof as lie between vertical planes drawn downward as above described, through the end lines of their locations, so continued in their own direction that such planes will intersect such exterior parts of such veins or ledges. And nothing in this section shall authorize the locator or possessor

of a vein or lode which extends in its downward course beyond the vertical lines of his claim to enter upon the surface of a claim owned or possessed by another."

Section 2324 in terms authorizes "the miners of each mining district to make regulations not in conflict with the laws of the United States, or with the laws of the State or Territory in which the district is situated, governing the location, manner of recording, amount of work necessary to hold possession of a mining claim, subject to the following requirements: The location must be distinctly marked on the ground so that its boundaries can be readily traced. All records of mining claims hereafter made shall contain the name or names of the locators, the date of the location, and such a description of the claim or claims located by reference to some natural object or permanent monument as will identify the claim. On each claim located after the tenth day of May, eighteen hundred and seventy-two, and until a patent has been issued therefor, not less than one hundred dollars' worth of labor shall be performed or improvements made during each year. On all claims located prior to the tenth day of May, eighteen hundred and seventy-two, ten dollars' worth of labor shall be performed or improvements made by the tenth day of June, eighteen hundred and seventy-four, and each year thereafter, for each one hundred feet in length along the vein until a patent has been issued therefor; but where such claims are held in common, such expenditure may be made upon any one claim; and upon a failure to comply with these conditions, the claim or mine upon which such failure occurred shall be open to relocation in the same manner as if no location of the same had ever been made, provided that the original locators, their heirs, assigns or legal representatives, have not resumed work upon the claim after failure and before such location."

Section 2325 provides for the issue of a patent. It reads:

"A patent for any land claimed and located for valuable deposits may be obtained in the following manner: Any person, association or corporation authorized to locate a claim under this chapter, having claimed and located a piece of

land for such purposes, who has, or have, complied with the terms of this chapter, may file in the proper land office an application for a patent, under oath, showing such compliance, together with a plat and field notes of the claim or claims in common, made by or under the direction of the United States surveyor general, showing accurately the boundaries of the claim or claims, which shall be distinctly marked by monuments on the ground, and shall post a copy of such plat, together with a notice of such application for a patent, in a conspicuous place on the land embraced in such plat previous to the filing of the application for a patent, and shall file an affidavit of at least two persons that such notice has been duly posted, and shall file a copy of the notice in such land office, and shall thereupon be entitled to a patent for the land, in the manner following: The register of the land office, upon the filing of such application, plat, field notes, notices and affidavits, shall publish a notice that such application has been made, for the period of sixty days, in a newspaper to be by him designated as published nearest to such claim; and he shall also post such notice in his office for the same period. The claimant, at the time of filing this application, or at any time thereafter, within the sixty days of publication, shall file with the register a certificate of the United States surveyor general that five hundred dollars' worth of labor has been expended or improvements made upon the claim by himself or grantors; that the plat is correct, with such further description by such reference to natural objects or permanent monuments as shall identify the claim, and furnish an accurate description, to be incorporated in the patent. At the expiration of the sixty days of publication the claimant shall file his affidavit, showing that the plat and notice have been posted in a conspicuous place on the claim during such period of publication. If no adverse claim shall have been filed with the register and the receiver of the proper land office at the expiration of the sixty days of publication, it shall be assumed that the applicant is entitled to a patent, upon the payment to the proper officer of five dollars per acre, and that no adverse claim exists; and thereafter

no objection from third parties to the issuance of a patent shall be heard, except it be shown that the applicant has failed to comply with the terms of this chapter."

Section 2326 is as follows:

" Where an adverse claim is filed during the period of publication it shall be upon oath of the person or persons making the same, and shall show the nature, boundaries and extent of such adverse claim, and all proceedings, except the publication of notice and making and filing of the affidavit thereof, shall be stayed until the controversy shall have been settled or decided by a court of competent jurisdiction, or the adverse claim waived. It shall be the duty of the adverse claimant, within thirty days after filing his claim, to commence proceedings in a court of competent jurisdiction to determine the question of the right of possession, and prosecute the same with reasonable diligence to final judgment; and a failure to do so shall be a waiver of his adverse claim. After such judgment shall have been rendered, the party entitled to the possession of the claim, or any portion thereof, may, without giving further notice, file a certified copy of the judgment roll with the register of the land office, together with the certificate of the surveyor general that the requisite amount of labor has been expended or improvements made thereon, and the description required in other cases, and shall pay to the receiver five dollars per acre for his claim, together with the proper fees, whereupon the whole proceedings and the judgment roll shall be certified by the register to the Commissioner of the General Land Office, and a patent shall issue thereon for the claim, or such portion thereof, as the applicant shall appear, from the decision of the court, to rightly possess. If it appears from the decision of the court that several parties are entitled to separate and different portions of the claim, each party may pay for his portion of the claim, with the proper fees, and file the certificate and description by the surveyor general, whereupon the register shall certify the proceedings and judgment roll to the Commissioner of the General Land Office, as in the preceding case, and patents shall issue to the several parties according to their respective rights. Nothing herein con-

tained shall be construed to prevent the alienation of the title conveyed by a patent for a mining claim to any person whatever."

These are the only provisions of the statute which bear upon the question presented.

The stress of the argument in favor of a negative answer to this question lies in the contention that by the terms of the statute exclusive possessory rights are granted to the locator. Section 2322 declares that the locators "shall have the exclusive right of possession and enjoyment of all the surface included within the lines of their location," and negatively that "nothing in this section shall authorize the locator or possessor of a vein or lode which extends in its downward course beyond the vertical lines of his claim to enter upon the surface of a claim owned or possessed by another." Hence, it is said that affirmatively and negatively it is provided that the locator shall have exclusive possession of the surface, and that no one shall have a right to disturb him in such possession. How then, it is asked, can any one have a right to enter upon such location for the purpose of making a second location. If he does so he is a trespasser, and it cannot be presumed that Congress intended that any rights should be created by trespass.

We are not disposed to undervalue the force of this argument, and yet are constrained to hold that it is not controlling. It must be borne in mind that the location is the initial step taken by the locator to indicate the place and extent of the surface which he desires to acquire. It is a means of giving notice. That which is located is called in section 2320 and elsewhere a "claim" or a "mining claim." Indeed, the words "claim" and "location" are used interchangeably. This location does not come at the end of the proceedings, to define that which has been acquired after all contests have been adjudicated. The location, the mere making of a claim, works no injury to one who has acquired prior rights. Some confusion may arise when locations overlap each other and include the same ground, for then the right of possession becomes a matter of dispute, but no location creates a right superior

to any previous valid location. And these possessory rights have always been recognized and disputes concerning them settled in the courts.

It will also be noticed that the locator is not compelled to follow the lines of the Government surveys, or to make his location in any manner correspond to such surveys. The location may, indeed, antedate the public surveys, but whether before or after them, the locator places his location where, in his judgment, it will cover the underlying vein. The law requires that the end lines of the claim shall be parallel. It will often happen that locations which do not overlap are so placed as to leave between them some irregular parcel of ground. Within that, it being no more than one locator is entitled to take, may be discovered a mineral vein and the discoverer desire to take the entire surface and yet it be impossible for him to do so and make his end lines parallel unless, for the mere purposes of location, he be permitted to place those end lines on territory already claimed by the prior locators.

Again, the location upon the surface is not made with the view of getting benefits from the use of that surface. The purpose is to reach the vein which is hidden in the depths of the earth, and the location is made to measure rights beneath the surface. The area of surface is not the matter of moment ; the thing of value is the hidden mineral below, and each locator ought to be entitled to make his location so as to reach as much of the unappropriated, and perhaps only partially discovered and traced vein, as is possible.

Further, Congress has not prescribed how the location shall be made. It has simply provided that it " must be distinctly marked on the ground so that its boundaries can be readily traced," leaving the details, the manner of marking, to be settled by the regulations of each mining district. Whether such location shall be made by stone posts at the four corners, or by simply wooden stakes, or how many such posts or stakes shall be placed along the sides and ends of the location, or what other matter of detail must be pursued in order to perfect a location, is left to the varying judgments of the mining districts. Such locations, such markings on the ground, are

not always made by experienced surveyors. Indeed, as a rule, it has been and was to be expected that such locations and markings would be made by the miners themselves — men inexperienced in the matter of surveying, and so in the nature of things there must frequently be disputes as to whether any particular location was sufficiently and distinctly marked on the surface of the ground. Especially is this true in localities where the ground is wooded or broken. In such localities the posts, stakes or other particular marks required by the rules and regulations of the mining district may be placed in and upon the ground, and yet, owing to the fact that it is densely wooded, or that it is very broken, such marks may not be perceived by the new locator, and his own location marked on the ground in ignorance of the existence of any prior claim. And in all places posts, stakes or other monuments, although sufficient at first and clearly visible, may be destroyed or removed, and nothing remain to indicate the boundaries of the prior location. Further, when any valuable vein has been discovered naturally many locators hurry to seek by early locations to obtain some part of that vein, or to discover and appropriate other veins in that vicinity. Experience has shown that around any new discovery there quickly grows up what is called a mining camp, and the contiguous territory is prospected and locations are made in every direction. In the haste of such locations, the eagerness to get a prior right to a portion of what is supposed to be a valuable vein, it is not strange that many conflicting locations are made, and, indeed, in every mining camp where large discoveries have been made locations, in fact, overlap each other again and again. *McEvoy* v. *Hyman*, 25 Fed. Rep. 596, 600. This confusion and conflict is something which must have been expected, foreseen — something which in the nature of things would happen, and the legislation of Congress must be interpreted in the light of such foreseen contingencies.

Still again, while a location is required by the statute to be plainly marked on the surface of the ground, it is also provided in section 2324 that, upon a failure to comply with certain named conditions, the claim or mine shall be open to reloca-

tion. Now, although a locator finds distinctly marked on the surface a location, it does not necessarily follow therefrom. that the location is still valid and subsisting. On the contrary, the ground may be entirely free for him to make a location upon. The statute does not provide, and it cannot be contemplated, that he is to wait until by judicial proceedings it has become established that the prior location is invalid or has failed before he may make a location. He ought to be at liberty to make his location at once, and thereafter, in the manner provided in the statute, litigate, if necessary, the validity of the other as well as that of his own location.

Congress has in terms provided for the settlement of disputes and conflicts, for by section 2325, when a locator makes application for a patent, (thus seeking to have a final determination by the Land Department of his title,) he is required to make publication and give notice so as to enable any one disputing his claim to the entire ground within his location to know what he is seeking, and any party disputing his right to all or any part of the location may institute adverse proceedings. Then by section 2326 proceedings are to be commenced in some appropriate court, and the decision of that court determines the relative rights of the parties. And the party who by that judgment is shown to be " entitled to the possession of the claim, or any portion thereof," may present a certified copy of the judgment roll to the proper land officers and obtain a patent " for the claim, or such portion thereof, as the applicant shall appear, from the decision of the court, to rightfully possess." And that the claim may be found to belong to different persons and that the right of each to a portion may be adjudicated is shown by a subsequent sentence in that same section, which provides that " if it appears from a decision of the court that several parties are entitled to sepa-ate and different portions of the claim, each party may pay for his portion of the claim . . . and patents shall issue to the several parties according to their respective rights." So it distinctly appears that notwithstanding the provision in reference to the rights of the locators to the possession of the surface ground within their locations, it was perceived that

locations would overlap, that conflicts would arise, and a method is provided for the adjustment of such disputes. And this, too, it must be borne in mind is a statutory provision for the final determination, and is supplementary to that right to enforce temporary possession, which, in accordance with the rules and regulations of mining districts, has always been recognized.

This question is not foreclosed by any decisions of this court as suggested by counsel. It is true there is language in some opinions which, standing alone, seems to sustain the contention. Thus, in *Belk* v. *Meagher*, 104 U. S. 279, 284, it is said :

" Mining claims are not open to relocation until the rights of a former locator have come to an end. A relocator seeks to avail himself of mineral in the public lands which another has discovered. This he cannot do until the discoverer has in law abandoned his claim, and left the property open for another to take up. The right of location upon the mineral lands of the United States is a privilege granted by Congress, but it can only be exercised within the limits prescribed by the grant. A location can only be made where the law allows it to be done. Any attempt to go beyond that will be of no avail. Hence a relocation on lands actually covered at the time by another valid and subsisting location is void ; and this not only against the prior locator, but all the world, because the law allows no such thing to be done."

And again, in *Gwillim* v. *Donnellan*, 115 U. S. 45, 49 :

" A valid and subsisting location of mineral lands, made and kept up in accordance with the provisions of the statutes of the United States, has the effect of a grant by the United States of the right of present and exclusive possession of the lands located. If, when one enters on land to make a location, there is another location in full force, which entitles its owner to the exclusive possession of the land, the first location operates as bar to the second."

The question presented in each of those cases was whether a second location is effectual to appropriate territory covered by a prior subsisting and valid location, and it was held it is

not. Of the correctness of those decisions there can be no doubt. A valid location appropriates the surface, and the rights given by such location cannot, so long as it remains in force, be disturbed by any acts of third parties. Whatever rights on or beneath the surface passed to the first locator can in no manner be diminished or affected by a subsequent location. But that is not the question here presented. Indeed, the form in which it is put excludes any impairment or disturbance of the substantial rights of the prior locator. The question is whether the lines of a junior lode location may be laid upon a valid senior location for the purpose of defining or securing "underground or extralateral rights not in conflict with any rights of the senior location." In other words, in order to comply with the statute, which requires that the end lines of a claim shall be parallel, and in order to secure all the unoccupied surface to which it is entitled, with all the underground rights which attach to possession and ownership of the surface, may a junior locator place an end line within the limits of a prior location?

In that aspect of the question the decisions referred to, although the language employed is general and broad, do not sustain the contention of counsel. This distinction is recognized in the text books. Thus in 1 Lindley on Mines, section 363, the author says:

"As a mining location can only be carved out of the unappropriated public domain, it necessarily follows that a subsequent locator may not invade the surface territory of his neighbors and include within his boundaries any part of a prior valid and subsisting location. But conflicts of surface area are more than frequent. Many of them arise from honest mistake, others from premeditated design. In both instances the question of priority of appropriation is the controlling element which determines the rights of the parties. Two locations cannot legally occupy the same space at the same time. These conflicts sometimes involve a segment of the same vein, on its strike; at others, they involve the dip-bounding planes underneath the surface. More frequently, however, they pertain to mere overlapping surfaces. The

same principles of law apply with equal force to all classes of cases. Such property rights as are conferred by a valid prior location, so long as such location remains valid and subsisting, are preserved from invasion, and cannot be infringed or impaired by subsequent locators. To the extent, therefore, that a subsequent location includes any portion of the surface lawfully appropriated and held by another, to that extent such location is void."

It will be seen that while the author denies the right of a second locator to enter upon the ground segregated by the first location, he recognizes the fact that overlapping locations are frequent, and declares the invalidity of the second location so far as it affects the rights vested in the prior locator, and in that he follows the cases from which we have quoted.

The practice of the Land Department has been in harmony with this view. The patents which were issued in this case for the Last Chance and New York claims give the entire boundaries of the original locations, and except from the grant those portions included within prior valid locations. So that on the face of each patent appears the original survey with the parallel end lines, the territory granted and the territory excluded. The instructions from the Land Department to the surveyors general have been generally in harmony with this thought. Thus, in a letter from the Commissioner of the Land Office to the surveyor general of Colorado, of date November 5, 1874, reported in 1 Copp's Land Owner, p. 133, are these instructions:

"In this connection I would state that the surveyor general has no jurisdiction in the matter of deciding the respective rights of parties in cases of conflicting claims.

"Each applicant for a survey under the mining act is entitled to a survey of the entire mining claim, as *located*, if held by him in accordance with the local laws and Congressional enactments.

"If, in running the exterior boundaries of a claim, it is found that two surveys conflict, the plat and field notes should show the extent of the conflict, giving the area which is embraced in both surveys, and also the distances from the

established corners at which the exterior boundaries of the respective surveys intersect each other."

Again, in a general circular issued by the Land Department on November 16, 1882, found in 9 Copp's Land Owner, p. 162, it is said: ·

"The regulations of this office require that the plats and field notes of surveys of mining claims shall disclose all conflicts between such surveys and prior surveys, giving the areas of conflicts.

"The rule has not been properly observed in all cases. Your attention is invited to the following particulars, which should be observed in the survey of every mining claim:

"1. The exterior boundaries of the claim should be represented on the plat of survey and in the field notes.

"2. The intersections of the lines of the survey, with the lines of conflicting prior surveys, should be noted in the field notes and represented upon the plat.

"3. Conflicts with unsurveyed claims, where the applicant for survey does not claim the area in conflict, should be shown by actual survey.

"4. The total area of the claim embraced by the exterior boundaries should be stated, and also the area in conflict with each intersecting survey, substantially as follows."

Again, on August 2, 1883, in a letter from the Acting Commissioner to the surveyor general of Arizona, reported in 10 Copp's Land Owner, p. 240, it is said:

"You state, and it is shown to be so by said diagram, that the said Grand Dipper lode, so located, is a four-sided figure with parallel end lines, the provisions of section 2320, U. S. Revised Statutes being fully complied with.

"The survey of the claim made by the deputy surveyor cuts off a portion of the right end, shown to be in conflict with the Emerald lode, the easterly end line of the Emerald claim thus becoming one of the boundary lines of the said 'Grand Dipper,' and not parallel to the easterly end line of the Grand Dipper survey.

"I cannot see how you can give your approval to such survey. No reason exists why the survey lines should not con-

form directly to the lines of the location, they being properly run in the first instance."

It is true that on December 4, 1884, a circular letter was issued by the Land Department which slightly qualifies the general instructions previously issued. So that it may, perhaps, be truthfully said that the practice of the Land Department has not been absolutely uniform, and yet the descriptions which are found in the patents before us show that notwithstanding the circular of 1884 the former practice still obtains.

It may be said that the statute gives to the first locator the right of exclusive possession; that an entry upon that territory with a view of making a subsequent location and marking on the ground its end and side lines is a trespass, and that to justify such an entry is to sanction a forcible trespass, and thus precipitate a breach of the peace. But no such conclusion necessarily follows. The case of *Atherton* v. *Fowler*, 96 U. S. 513, illustrates this. It appeared that one Page was in lawful possession of certain premises claimed under a Mexican grant, though his title had not been confirmed by any act of Congress; that while so in possession a party of persons who had no interest or claim to any part of the land, invaded it by force, tore down the fences, dispossessed those who occupied, and built on and cultivated parts of it under pretence of establishing a right of preëmption to the several parts which they had so seized. It was held that such forcible seizure of the premises gave no rights under the preëmption law, and it was said (p. 516):

"It is not to be presumed that Congress intended, in the remote regions where these settlements are made, to invite forcible invasion of the premises of another, in order to confer the gratuitous right of preference of purchase on the invaders. In parts of the country where these preëmptions are usually made, the protection of the law to rights of person and property is generally but imperfect under the best of circumstances. It cannot, therefore, be believed, without the strongest evidence, that Congress has extended a standing invitation to the strong, the daring and the unscrupulous to dispossess by

force the weak and the timid from actual improvements on the public lands, in order that the intentional trespasser may secure by these means the preferred right to buy the land of the Government when it comes into market."

But while thus declaring that it cannot be presumed that Congress countenanced any such forcible seizure of premises, the court also observed (p. 516):

" Undoubtedly there have been cases, and may be cases again, where two persons making settlement on different parts of the same quarter section of land may present conflicting claims to the right of preëmption of the whole quarter section, and neither of them be a trespasser upon the possession of the other, for the reason that the quarter section is open, unenclosed, and neither party interferes with the actual possession of the other. In such cases, the settlement of the latter of the two may be *bona fide* for many reasons. The first party may not have the qualifications necessary to a preemptor, or he may have preëmpted other land, or he may have permitted the time for filing his declaration to elapse, in which case the statute expressly declares that another person may become preëmptor, or it may not be known that the settlements are on the same quarter."

The distinction thus suggested is pertinent here. A party who is in actual possession of a valid location may maintain that possession and exclude every one from trespassing thereon, and no one is at liberty to forcibly disturb his possession or enter upon the premises. At the same time the fact is also to be recognized that these locations are generally made upon lands open, unenclosed and not subject to any full actual occupation, where the limits of possessory rights are vague and uncertain and where the validity of apparent locations is unsettled and doubtful. Under those circumstances it is not strange — on the contrary it is something to be expected and, as we have seen, is a common experience — that conflicting locations are made, one overlapping another, and sometimes the overlap repeated by many different locations. And while in the adjustment of those conflicts the rights of the first locator to the surface within his location, as well as to veins

beneath his surface, must be secured and confirmed, why should a subsequent location be held absolutely void for all purposes and wholly ignored? Recognizing it so far as it establishes the fact that the second locator has made a claim, and in making that claim has located parallel end lines, deprives the first locator of nothing. Certainly, if the rights of the prior locator are not infringed upon, who is prejudiced by awarding to the second locator all the benefits which the statute gives to the making of a claim? To say that the subsequent locator must — when it appears that his lines are to any extent upon territory covered by a prior valid location — go through the form of making a relocation simply works delay and may prevent him, as we have seen, from obtaining an amount of surface to which he is entitled, unless he abandons the underground and extralateral rights which are secured only by parallel end lines.

In this connection it may be properly inquired what is the significance of parallel end lines? Is it to secure to the locator in all cases a tract in the shape of a parallelogram? Is it that the surveys of mineral land shall be like the ordinary public surveys in rectangular form, capable of easy adjustment, and showing upon a plat that even measurement which is so marked a feature of the range, township and section system? Clearly not. While the contemplation of Congress may have been that every location should be in the form of a parallelogram, not exceeding 1500 by 600 feet in size, yet the purpose also was to permit the location in such a way as to secure not exceeding 1500 feet of the length of a discovered vein, and it was expected that the locator would so place it as in his judgment would make the location lengthwise cover the course of vein. There is no command that the side lines shall be parallel, and the requisition that the end lines shall be parallel was for the purpose of bounding the underground extralateral rights which the owner of the location may exercise. He may pursue the vein downwards outside the side lines of his location, but the limits of his right are not to extend on the course of the vein beyond the end lines projected downward through the earth. His rights on the surface are

bounded by the several lines of his location, and the end lines must be parallel in order that going downwards he shall acquire no further length of the vein than the planes of those lines extended downward enclose. If the end lines are not parallel, then, following their planes downward his rights will be either converging and diminishing or diverging and increasing the farther he descends into the earth. In view of this purpose and effect of the parallel end lines it matters not to the prior locator where the end lines of the junior location are laid. No matter where they may be, they do not disturb in the slightest his surface or underground rights.

For these reasons, therefore, we are of opinion that the first question must be answered in the affirmative.

It may be observed in passing that the answer to this question does not involve a decision as to the full extent of the rights beneath the surface which the junior locator acquires. In other words, referring to the first diagram, the inquiry is not whether the owners of the Last Chance have a right to pursue the vein as it descends into the ground south of the dotted line *r s*, even though they should reach a point in the descent in which the rights of the owners of the New York, the prior location, have ceased. It is obvious that the line *e h*, the end line of the New York claim, extended downward into the earth will at a certain distance pass to the south of the line *r s*, and a triangle of the vein will be formed between the two lines, which does not pass to the owners of the New York. The question is not distinctly presented whether that triangular portion of the vein up to the limits of the south end line of the Last Chance, *b c*, extended vertically into the earth, belongs to the owners of the Last Chance or not, and therefore we do not pass upon it. Perhaps the rights of the junior locator below the surface are limited to the length of the vein within the surface of the territory patented to him, but it is unnecessary now to consider that matter. All that comes fairly within the scope of the question before us is the right of the owners of the Last Chance to pursue the vein as it dips into the earth westwardly between the line *a d t* and the line *r s*, and to appropriate so much of it as is not held by the prior

location of the New York, and to that extent only is the question answered. The junior locator is entitled to have the benefit of making a location with parallel end lines. The extent of that benefit is for further consideration.

The second question needs no other answer than that which is contained in the discussion we have given to the first question, and we, therefore, pass it.

The third question is also practically answered by the same considerations, and in the view we have taken of the statutes the easterly side of the New York lode mining claim is not the end line of the Last Chance lode mining claim.

The fourth question presents a matter of importance, particularly in view of the inferences which have been drawn by some trial courts, state and national, from the decisions of this court. That question is —

"If the apex of a vein crosses one end line and one side line of a lode mining claim, as located thereon, can the locator of such vein follow it upon its dip beyond the vertical side line of his location ?"

The decisions to which we refer are *Mining Company* v. *Tarbet*, 98 U. S. 463; *Iron Silver Mining Company* v. *Elgin Mining Company*, 118 U. S. 196; *Argentine Mining Company* v. *Terrible Mining Company*, 122 U. S. 478; *King* v. *Amy &c. Mining Company*, 152 U. S. 222.

Two of these cases have been already noticed in this opinion. In *Mining Company* v. *Tarbet* a surface location, 2600 feet long and 100 feet wide had been made. This location was so made on the supposition that it followed lengthwise the course of the vein, and the claim was of the ownership of 2600 feet in length of such vein. Subsequent explorations developed that the course of the vein was at right angles to that which had been supposed, and that it crossed the side lines, so that there was really but 100 feet of the length of the vein within the surface area. It was held that the side lines were to be regarded as the end lines. In *Iron Silver Mining Company* v. *Elgin Mining Company* the location was in the form of a horseshoe. The end lines were not parallel. The location was quite irregular in form, and

inasmuch as one of the side lines was substantially parallel with one of the end lines it was contended that this side line should be considered an end line, and this although the vein did not pass through such side line.  But the court refused to recognize any such contention and held that the end lines were those which were in fact end lines of the claim as located, and that as they were not parallel there was no right to follow the vein on its dip beyond the side lines.  In *Argentine Mining Company* v. *Terrible Mining Company* the claims of the plaintiff and defendant crossed each other, and in its decision the court affirmed the ruling in *Mining Company* v. *Tarbet*, saying (p. 485):

"When, therefore, a mining claim crosses the course of the lode or vein instead of being 'along the vein or lode,' the end lines are those which measure the width of the claim as it crosses the lode.  Such is evidently the meaning of the statute.  The side lines are those which measure the extent of the claim on each side of the middle of the vein at the surface."

In *King* v. *Amy &c. Mining Company* the prior cases were reaffirmed, and those lines which on the face of the location were apparently side lines were adjudged end lines because the vein on its course passed through them, the location being not along the course of the vein but across it.  But in neither of these cases was the question now before us presented or determined.  All that can be said to have been settled by them is, first, that the lines of the location as made by the locator are the only lines that will be recognized; that the courts have no power to establish new lines or make a new location; second, that the contemplation of the statute is that the location shall be along the course of the vein, reading, as it does, that a mining claim "may equal, but shall not exceed, 1500 feet in length along the vein or lode;" and, third, that when subsequent explorations disclose that the location has been made not along the course of the vein, but across it, the side lines of the location become in law the end lines.  Nothing was said in either of these cases as to how much of the apex of the vein must be found within the surface, or what rule obtains in case the vein crosses only one

end line. So, when *Last Chance Mining Company* v. *Tyler Mining Company*, 157 U. S. 683, 696, was before us, (in which the question here stated was presented but not de-. cided, the case being disposed of on another ground,) we said, after referring to the prior cases, "but there has been no decision as to what extraterritorial rights exist if a vein enters at an end and passes out at a side line."

We pass, therefore, to an examination of the provisions of the statute. Premising that the discoverer of a vein makes the location, that he is entitled to make a location not exceeding 1500 feet in length along the course of such vein and not exceeding "three hundred feet on each side of the middle of the vein at the surface," that a location thus made discloses end and side lines, that he is required to make the end lines parallel, that by such parallel end lines he places limits not merely to the surface area but limits beyond which below the surface he cannot go on the course of the vein, that it must be assumed that he will take all of the length of the vein that he can, we find from section 2322 that he is entitled to "all veins, lodes and ledges throughout their entire depth, the top or apex of which lies inside of such surface lines extended downward vertically." Every vein whose apex is within the vertical limits of his surface lines passes to him by virtue of his location. He is not limited to only those veins which extend from one end line to another, or from one side line to another, or from one line of any kind to another, but he is entitled to every vein whose top or apex lies within his surface lines. Not only is he entitled to all veins whose apexes are within such limits, but he is entitled to them throughout their entire depth, "although such veins, lodes or ledges may so far depart from a perpendicular in their course downward as to extend outside the vertical side lines of such surface locations." In other words, given a vein whose apex is within his surface limits he can pursue that vein as far as he pleases in its downward course outside the vertical side lines. But he can pursue the vein in its depth only outside the vertical side lines of his location, for the statute provides that the "right of possession to such

outside parts of such veins or ledges shall be confined to such portions thereof as lie between vertical planes drawn downward as above described, through the end lines of their locations, so continued in their own direction that such planes will intersect such exterior parts of such veins or ledges."

This places a limit on the length of the vein beyond which he may not go, but it does not say that he shall not go outside the vertical side lines unless the vein in its course reaches the vertical planes of the end lines. Nowhere is it said that he must have a vein which either on or below the surface extends from end line to end line in order to pursue that vein in its dip outside the vertical side lines. Naming limits, beyond which a grant does not go, is not equivalent to saying that nothing is granted which does not extend to those limits. The locator is given a right to pursue any vein, whose apex is within his surface limits, on its dip outside the vertical side lines, but may not in such pursuit go beyond the vertical end lines. And this is all that the statute provides. Suppose a vein enters at an end line, but terminates half way across the length of the location, his right to follow that vein on its dip beyond the vertical side lines is as plainly given by the statute as though in its course it had extended to the farther end line. It is a vein, "the top or apex of which lies inside of such surface lines extended downward vertically." And the same is true if it enters at an end and passes out at a side line.

Our conclusions may be summed up in these propositions: First, the location as made on the surface by the locator determines the extent of rights below the surface. Second, the end lines, as he marks them on the surface, with the single exception hereinafter noticed, place the limits beyond which he may not go in the appropriation of any vein or veins along their course or strike. Third, every vein " the top or apex of which lies inside of such surface lines extended downward vertically " becomes his by virtue of his location, and he may pursue it to any depth beyond his vertical side lines, although in so doing he enters beneath the surface of some other proprietor. Fourth, the only exception to the rule that the end lines of the location as the locator places them establish the

limits beyond which he may not go in the appropriation of a vein on its course or strike is where it is developed that in fact the location has been placed not along but across the course of the vein. In such case the law declares that those which the locator called his side lines are his end lines, and those which he called end lines are in fact side lines, and this upon the proposition that it was the intent of Congress to give to the locator only so many feet of the length of the vein, that length to be bounded by the lines which the locator has established of his location. "Our laws have attempted to establish a rule by which each claim shall be so many feet of the vein, lengthwise of its course, to any depth below the surface, although laterally its inclination shall carry it ever so far from a perpendicular." *Mining Company* v. *Tarbet*, 98 U. S. 463, 468.

These conclusions find support in the following decisions: *Stevens* v. *Williams*, 1 McCrary, 480, 490, in which is given the charge of Mr. Justice Miller to a jury, in the course of which he says: "You must take all the evidence together; you must take the point where it ends on the south, where it ends on the north, where it begins on the west and is lost on the east, and the course it takes; and from all that you are to say what is its general course. The plaintiff is not bound to lay his side lines perfectly parallel with the course or strike of the lode, so as to cover it exactly. His location may be made one way or the other, and it may so run that he crosses it the other way. In such event his end lines become his side lines, and he can only pursue it to his side lines, vertically extended, as though they were his end lines, but if he happens to strike out diagonally, as far as his side lines include the apex, so far he can pursue it laterally." *Wakeman* v. *Norton*, decided by the Supreme Court of Colorado, June 1, 1897, 49 Pac. Rep. 283, in which Mr. Justice Goddard, whose opinions, by virtue of his long experience as trial judge in the mining districts of Leadville and Aspen as well as on the supreme bench of the State, are entitled to great consideration, said (p. 286): "In instructing the jury that, in order to give any extralateral rights, it was essential that the apex or top of a vein should

on its course pass through both end lines of a claim, the court imposed a condition that has not heretofore been announced as an essential to the exercise of such right in any of the adjudicated cases." *Fitzgerald* v. *Clark*, 17 Montana, 100, a case now pending in this court on writ of error. *Tyler Mining Company* v. *Last Chance Mining Company*, Court of Appeals, Ninth Circuit, decided by Circuit Judge McKenna, now a Justice of this court, Circuit Judge Gilbert and District Judge Hawley, 7 U. S. App. 463. *Consolidated Wyoming Gold Mining Company* v. *Champion Mining Company*, Circuit Court Northern District California, decided by Hawley, District Judge, 63 Fed. Rep. 540. *Tyler Mining Company* v. *Last Chance Mining Company*, Circuit Court District of Idaho, decided by Beatty, District Judge, who in the course of his opinion pertinently observed: " What reason under the law can be assigned why these rights shall not apply when his location is such that his ledge passes through it in some other way than from end to end? The law does not say that his ledge must run from end to end, but he is granted this right of following 'all. veins, lodes and ledges throughout their entire depth, the top or apex of which lies inside of his surface lines.' Upon the fact that an apex is within his surface lines, all his underground rights are based. When, then, he owns an apex, whether it extends through the entire or through but a part of its location, it should follow that he owns an equal length of the ledge to its utmost depth. These are the important rights granted by the law. Take them away, and we take all from the law that is of value to the miner." 71 Fed. Rep. 848, 851. *Carson City Gold and Silver Mining Company* v. *North Star Mining Company*, Circuit Court Northern District of California, decided by Beatty, District Judge, 73 Fed. Rep. 597. *Republican Mining Company* v. *Tyler Mining Company*, Circuit Court of Appeals, Ninth Circuit, decided by Circuit Judges Gilbert and Ross and District Judge Hawley, 48 U. S. App. 213. See also 2 Lindley on Mines, section 591.

The fourth question, therefore, is answered in the affirmative.

The fifth question in effect seeks from this court a decision

of the whole case, and therefore is not one which this court is called upon to answer. *Cross* v. *Evans*, 167 U. S. 60; *Warner* v. *New Orleans*, 167 U. S. 467.

> *It will, therefore, be certified to the Court of Appeals that the first question is answered in the affirmative, the third in the negative, the fourth in the affirmative. The second and fifth are not answered.*