UNITED STATES et al. v. WILSHIRE OIL CO., Inc., et al.

No. 126–M.

District Court, S. D. California, Central Division.

Dec. 31, 1934.

Peirson M. Hall, U. S. Atty., and Clyde Thomas, Asst. U. S. Atty., both of Los Angeles, Cal., for plaintiffs.

Robert B. Murphey, William L. Murphey, and Alex W. Davis, all of Los Angeles, Cal., for defendants.

McCORMICK, District Judge.

This suit in equity was commenced by the United States attorney for this judicial district on December 14, 1933. The action is authorized under section 3 (c) of the National Industrial Recovery Act (48 Stat. 195, 15 USCA § 703 (c), and is on behalf of the government and its Administrator of the Code of Fair Competition for the Petroleum Industry, as complainants, against the Wilshire Oil Company, Inc., a corporation, organized and existing under the laws of the state of California, its officers and directors, and certain other corporate bodies engaged in the oil industry which are affiliates of the Wilshire Oil Company, as defendants.

The objective of complainants is to obtain a mandatory injunction restraining the defendants from producing crude oil or any product thereof from their respective wells in Santa Fé Springs and in the Huntington Beach oil fields of California in excess of the amounts allocated in and by the quotas and operating schedules as now compiled, and as they may be hereafter compiled and approved, pursuant to and in accordance with the terms of the Code of Fair Competition for the Petroleum Industry which has been established and promulgated under the authority of the National Industrial Recovery Act § 3 (15 USCA § 703).

The sole matters before the court at this time, and the only issues which are considered or determined now, are:

The right of complainants to an injunction pendente lite to compel the defendants to comply with quotas and operating schedules regulating the production of crude oil, gas, and petroleum products from their wells, in conformity with orders issued by governmental agencies under dates of July 26, 1934, and September 28, 1934, respectively, and any order amendatory or supplementary thereto that may be hereafter issued pursuant to the aforesaid Petroleum Code; and also to restrain defendants from withdrawing oil from storage, pending the final decision of this suit on the merits, without the approval of the Planning and Co-ordination Committee which has been established by the oil industry under said Petroleum Code; and in the event that such temporary injunctive relief is denied;

The right of defendants to a prohibitory injunction pendente lite restraining the government agents from attempting to apply or enforce the two aforesaid orders or any order made under authority of the Petroleum Code or the National Industrial Recovery Act, as against the production of crude oil, gas, or petroleum products from their wells respectively at either of the aforesaid California oil fields; and so restraining said governmental agencies from interfering with the defendants' withdrawal from storage of oil or petroleum products produced, or produced and refined, or to be refined, within the state of California.

There has been no restraining order issued against defendants on the original bill of complaint. From time to time the government's application for temporary injunction has been continued, inasmuch as the defendants had been voluntarily complying with the allocations and quotas of the governmental agencies in the conduct of their oil producing and refining until August, 1934.

It is admitted that the corporate defendants since that time have been exceeding production allocated to their oil wells by the orders made by the governmental authority, and the complainants on November 27, 1934, filed an amended and supplemental bill to restrain further excess production over governmental allocations, and to prohibit storage removals without governmental authority. Thereupon an order was directed to defendants requiring them to show cause why they should not be so restrained pendente lite. The application for temporary injunction, in addition to the verified supplemental bill, is supported by affidavits filed herein.

The defendants have joined issue upon the supplemental bill by filing a verified answer to it, and have also filed a verified counterclaim, also supported by affidavits, seeking the aforesaid affirmative relief of prohibitory injunction against the government agents' orders, allocations, and quotas.

It is considered unnecessary to the determination of the issues before the court at this time to specifically analyze or to discuss in detail the allegations contained in the pleadings or the facts disclosed by the affidavits which have been filed in support of and in opposition to the respective motions for interlocutory injunction. Many of such matters must be and should be left to the hearing on the merits of this suit where they can be adequately and fully presented by the respective suitors. This cannot be done and is not expected to be done upon applications for temporary injunctions.

In an action like the one before the court, where the government is proceeding under an act of Congress that is designed to aid the constitutional national prerogative of regulating foreign or interstate commerce, or of restraining intrastate activities which interfere with and burden such national prerogative, all that need be shown to warrant the issuance of an injunction until the case can be heard and decided on its merits is that upon consideration and weighing of all equities, greater damage to the general welfare and public interest involved is probable if the status quo of the controversy is maintained pending suit, than if the governmental regulations are observed during such period. I am satisfied from a study of the issues of this case as they are revealed in the record now before the court, and as they are illumined by judicial knowledge of the oil industry as reflected in equity receiverships which have come into this court, as well as from the history of the times, that the government is entitled to require the defendants to comply with the two allocation orders of crude oil production in suit, pending final decision of this case.

The orders which are assailed by defendants may be epitomized as regulations promulgated by the Administrator of the Petroleum Code under the provisions of title 1 of the National Industrial Recovery Act (15 USCA § 701 et seq.), whereby certain persons active in the oil industry in California are designated by the Administrator

as the agency of the government to compile and recommend to him crude oil production quotas, pursuant to economic principles and statistical methods that are specified in the orders, and in accordance with the total crude oil quota for California, as the National Administrator of the Petroleum Code shall certify it from time to time, to bring about and conserve an equitable and fair trade balance, to supply the oil consumers' demand of the country, and to prevent waste and disruption of established markets for petroleum and its products among the states of the Union. The plan that is designated in the orders recognizes three geographical, separate, and distinct oil producing districts within California, viz., the San Joaquin Valley, the Coastal Counties, and the Los Angeles Basin; and the total state quota which is certified by the National Administrator of the Petroleum Code is subdivided among the three districts by the agency to balance production to the established total consumptive demand for petroleum and its products from the three districts respectively as it is determined from the statistical records of the United States Bureau of Mines. Then there is a further division of production into fields and again into pools within the respective districts, and finally an allotment and allowable production to each well within each pool.

From the showing made at the hearing of the motions for preliminary injunction, it appears that there has been during the months of July, August, September, and October, 1934, no consumptive demand in California for crude oil produced in excess of the total allowables established and fixed by the Administrator's orders. If such conclusion is correct, and accurately forecasts future market conditions, and I believe it presumptively does, then any production of crude oil in excess of the Administrator's quotas either causes waste or goes into and affects the stream of interstate and foreign petroleum transactions. Either and both of these results demand regulation, in order that sound and fair competition may be fostered, and a most valuable natural resource may be conserved as far as it is consistent with the current requirements of safety, business, and industry to do so. Because of the national scope of the unique and integrated petroleum industry and its supreme importance in national security, federal authority appears to be the only adequate regulating power. Therefore the vital substantial question for decision is whether or not such author-

ity can be lawfully directed against defendants' oil production operations in the two aforesaid districts.

The defendant companies are operating, in their producing, refining, transporting, and marketing, actual activities, entirely within the state of California. They claim, therefore, that inasmuch as the National Industrial Recovery Act and the Code of Fair Competition for the Petroleum Industry relate solely to interstate and foreign commerce, the two allocation orders made solely under the authority thereof are ineffectual as to them, their oil wells, and their production processes.

Before crude oil production in concrete cases can be accurately characterized as a purely local or as a national instrumentality of commerce, it should be surveyed in the light of present-day economic and industrial conditions and requirements, and it is imperative that it be scrutinized under established geological factors that appear in no other known activity. Not much aid is furnished by precedents that relate to other enterprises or commodities or that are not commensurate with existing conditions in the producing features of the oil business. Says the Supreme Court in Ohio Oil Company v. Indiana, 177 U. S. 203, 20 S. Ct. 576, 581, 44 L. Ed. 729: "Petroleum gas and oil are substances of a peculiar character, and decisions in ordinary cases of mining for coal, and other minerals which have a fixed situs, cannot be applied to contracts concerning them without some qualifications." And in the recent case of Ryan v. Amazon Petroleum Corporation, 71 F.(2d) 1, 4,[1] the Fifth Circuit Court of Appeals, in considering many decisions of the Supreme Court that relate to a determination of whether mining, manufacturing, generating electricity, etc., within a state are subject to federal regulation under the Commerce Clause of the Constitution, said: "Oil production is either mining or manufacture. Neither the one nor the other is ordinarily within the power of Congress to regulate within a state. * * * It may be that under peculiar circumstances, such for example as are here shown to exist in the relation of oil production in Texas to commerce in oil with and among the other states, such a burden on or interference with interstate commerce may exist as to justify Congressional action, as in the case of intrastate rates which injuriously affect interstate commerce."

---

[1] Decree reversed 55 S. Ct. 353, 79 L. Ed. —.

The wells of the respective defendant companies in the two oil fields of the Los Angeles District are admittedly penetrating the same oil producing zones from which other oil enterprises are extracting crude oil, gas, and natural gasoline which is by such other concerns put into and utilized in the stream of their respective interstate and foreign business. All of such other producers are complying with the allocation and quota orders which are resisted by the defendants.

It is evident that if the defendants are not required to comply with fair and nondiscriminating allocations of crude oil production, the other producers in the same field or pool or zone will be forced to exceed their quotas in order to get their just share of the oil in the reservoir which is a common source of supply to all penetrating and operating therein. Such unregulated overproduction will necessarily upset the balance of the determined consumer demand for petroleum products, in California primarily, but also in other states and in foreign countries, where the trade is being supplied with crude oil and petroleum products which originate in and are produced from the common source of supply.

The defendants by their pleadings and in affidavits do raise an issue that discrimination has been practiced by the government agencies in California against them and in favor of the other companies which are producing oil from the same fields and zones. There is a denial in the affidavits on the part of the complainants of this charge of favoritism, and in view of the conflict it cannot be determined at this time, but is reserved for further consideration at the hearing of this suit on the merits, when this important issue can be properly explored by the court and definite findings and conclusions upon it can be made. Of course, if it is established that the methods or orders of the Administrator of the Petroleum Code are arbitrary or discriminatory, they will not be sustained in a court of equity. Nevertheless, it is noteworthy, in connection with defendants' claim of unjust discrimination, that the affidavits on file, without denial, show that although the Administrator has provided facilities for appeal and review of any of the allocation orders, the defendants have not availed themselves of recourse to such administrative processes to remedy the alleged inequities that they now complain of in this suit.

The following language of the Supreme Court in Ohio Oil Company v. Indiana, supra, is strikingly applicable to the close drilling operations of defendants and others that exist in the two California oil fields and the extraction of crude oil therefrom: "No time need be spent in restating the general common-law rule that the ownership in fee of the surface of the earth carries with it the right to the minerals beneath, and the consequent privilege of mining to extract them. And we need not, therefore, pause to consider the scope of the legislative authority to regulate the exercise of mining rights and to direct the methods of their enjoyment so as to prevent the infringement by one miner of the rights of others. Del Monte Mining & Mill. Co. v. Last Chance Mining & Mill. Co., 171 U. S. 55, 60, 18 S. Ct. 895, 43 L. Ed. 72, 74. The question here arising does not require a consideration of the matters just referred to, but it is this: Does the peculiar character of the substances, oil and gas, which are here involved, the manner in which they are held in their natural reservoirs, the method by which and the time when they may be reduced to actual possession or become the property of a particular person, cause them to be exceptions to the general principles applicable to other mineral deposits, and hence subject them to different rules? True it is that oil and gas, like other minerals, are situated beneath the surface of the earth, but except for this one point of similarity, in many other respects they greatly differ. They have no fixed situs under a particular portion of the earth's surface within the area where they obtain. They have the power, as it were, of self-transmission. No one owner of the surface of the earth, within the area beneath which the gas and oil move, can exercise his right to extract from the common reservoir, in which the supply is held, without, to an extent, diminishing the source of supply as to which all other owners of the surface must exercise their rights. The waste by one owner, caused by a reckless enjoyment of his right of striking the reservoir, at once, therefore, operates upon the other surface owners. Besides, whilst oil and gas are different in character, they are yet one, because they are unitedly held in the place of deposit."

In any present-day evaluation of the effect on commerce of the established legal doctrine of capture that applies to crude oil production, notice must be given to the geological fact that an oil structure is a reservoir of oil, gas, and gas in solution, and that it becomes a gas and hydraulic engine when

the first well disturbs the equilibrium of the gaseous, hydraulic, and rock pressures which was necessary to retain the pool in that particular place. This interference recurs with each penetrating contact with the reservoir. Drilling wells into various parts of the field produces gas or oil, or both; or water, or oil and water; or dry holes; all depending upon their location. The maximum ultimate recovery of oil can therefore be brought about only by mandatory regulation of production elements so as to utilize these reservoir forces for the production of crude oil, rather than permitting the dissipation of gas or the channeling of water through oil sands to the wells.

If the ancient rule of capture is stretched to its broadest sense, it will recognize no right to governmental protection, even against the malicious waste of naval oil reserves or of natural resources of the nation, regardless of the present-day nearness to one another of separately controlled producing wells. So important to-day are regulating safeguards to commerce that Mr. Justice Butler, writing for the Supreme Court, in the recent case of Champlin Rfg. Co. v. Commission, 286 U. S. 228, 52 S. Ct. 559, 562, 76 L. Ed. 1062, 86 A. L. R. 403, said: "Where proportional taking from the wells in flush pools is not enforced, operators who do not have physical or market outlets are forced to produce to capacity in order to prevent drainage to others having adequate outlets."

The blending and intermingling of the interstate commerce instrumentalities of the pool neighbors of the defendants with their media of intrastate business is so intimate and inextricable that the protection of the former by federal power, which is indisputable, cannot be accomplished without the regulation of the latter by the same authority. See Coronado Coal Co. v. United Mine Workers, 268 U. S. 295, 45 S. Ct. 551, 69 L. Ed. 963; Houston, E. & W. T. Railway v. U. S., 234 U. S. 342, 34 S. Ct. 833, 58 L. Ed. 1341; Minnesota Rate Cases (Simpson v. Shepard), 230 U. S. 352, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18.

One has but to superficially note the indispensability of petroleum products in national security and transportation to appreciate the magnitude and singular situation in the United States of the oil industry. It is the industry as an entity that is sought to be regulated by the federal government, and not merely some part of it. This in-

dustry is sui generis. It is so necessarily interrelated with and among all of the states that, regardless of where any crude oil production instrumentality of it may be physically located, the business is of itself national in scope and effect. Although less than a score of the states furnish all of the domestic production of crude oil, the market for this peculiar commodity and its products is not only nation-wide, but extends to our territories and insular possessions as well, and even to foreign lands.

It seems to me that such a wide stream of commerce as the petroleum industry can be successfully protected only by regulating its flow at the source; and while it may be held that the producing well, when viewed apart from its co-relative facilities, is intrastate, nevertheless when the industry is considered the well occupies no such local or restricted channel.

In Stafford v. Wallace, 258 U. S. 518, 42 S. Ct. 397, 403, 66 L. Ed. 735, 23 A. L. R. 229, Chief Justice Taft, in quoting Justice Holmes, writing for the Supreme Court in Swift & Co. v. U. S., 196 U. S. 398, 25 S. Ct. 276, 49 L. Ed. 518, said: "Commerce among the states is not a technical legal conception, but a practical one, drawn from the course of business." If this salutary principle is applied to the oil business in our country, as it appears to me it has been by Congress, there is no question as to the right of the Administrator of the Petroleum Code to regulate the production of crude oil from the defendants' wells, as it has been, at least to a prima facie degree, established that production by the defendant companies in the two California districts in excess of the Administrator's quota will affect the free flow of interstate and foreign commerce.

No one reading the National Industrial Recovery Act can fail to observe the plain and obvious purpose of Congress in its enactment of this emergency and remedial statute. It is clearly stated that, "A national emergency productive of widespread unemployment and disorganization of industry, which burdens interstate and foreign commerce * * * is hereby declared to exist," and that it is the congressional policy "to remove obstructions to the free flow of interstate and foreign commerce which tend to diminish the amount thereof * * * to eliminate unfair competitive practices * * * to avoid undue restriction of production (except as may be temporarily re-

quired), * * *. and to conserve natural resources." Section 1 (15 USCA § 701).

There is little room to doubt the right of Congress to legislate to attain its expressed policy, and this court cannot substitute its judgment on the wisdom of the legislative policy. To the contrary, the statute being remedial and an emergency measure, and clear in its terms, it is the duty of the court to broadly apply it to effect its object.

"Let the end be legitimate," said Chief Justice Marshall in McCulloch v. Maryland, 4 Wheat. 316, 421, 4 L. Ed. 579. "Let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." See, also, Wilson v. New, 243 U. S. 332, 37 S. Ct. 298, 61 L. Ed. 755, L. R. A. 1917E, 938, Ann. Cas. 1918A, 1024.

It is difficult to conceive of a more necessary and suitable means to regulate interstate and foreign traffic in petroleum products, in a general industrial depression, than to methodize crude oil production. Such regulation satisfactorily appears at this time to be the function and purpose of the applicable sections of the Petroleum Code and the two orders under consideration. The defendant companies, having produced crude oil in excess of the quota, thereby affect interstate and foreign commerce, and are deemed to be using an unfair method of competition in commerce, in violation of subdivision (b) of section 3 of the National Industrial Recovery Act (15 USCA § 703 (b), and article III of the Petroleum Code.

There is no doubt as to the constitutionality of the National Industrial Recovery Act, as far as it relates to interstate and foreign commerce. It is clearly authorized by article 1, § 8, cl. 3, of our organic law. Congress is there given the power "to regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." These words impart powers, prerogatives, and responsibilities in the federal government that are not static. They are sufficiently elastic to meet changing economic, industrial, and social conditions in our national life without infringing upon guaranteed private property rights or invading unsurrendered exclusive state authority at such times.

I believe it is undeniable that the purpose of Congress in the Recovery Act was to assist economic and industrial rehabilitation in the United States by removing obstructions to interstate and foreign commerce. This is clearly a federal power, and in exercising it anything that is reasonably and seasonably adapted to accomplish the congressional purpose and that is not clearly prohibited by our dual systems of government should be sustained by the courts.

And in dealing with the contemporaneous petroleum industry specifically, a practical conception of the locale, magnitude, and instrumentalities of the business, rather than the blind adherence to archaic precedents, should be the judicial yardstick for measuring the extent and validity of remedial legislation. Consequently, expressions in some early opinions that localize valid public regulations of crude oil production cannot be used to-day to measure modern regulatory requirements of the petroleum industry in the United States. It is now a huge integrated entity whose units are inseparably linked around all of the states, and whose protection is necessary for national security. It appears to me that only by an unwarranted stretch of construction can present-day regulation of crude oil in the petroleum industry be regarded as one of the reserved powers of the states under the Tenth Amendment to the Constitution.

Any objection to the Recovery Act or to the Petroleum Code upon the ground that there reposes in either an unlawful delegation of legislative power is without merit.

The general rule applicable to remedial statutes that create administrative agencies to effectuate the purposes of the law is that Congress is required to legislate on the subject so far as reasonably practicable, and to express its purpose by the declaration of an intelligible principle, and leave to the person or body authorized in the act to administer it the power to supply the details, methods, and regulations and standards which will operate to accomplish the purpose of the statute. Buttfield v. Stranahan, 192 U. S. 470, 24 S. Ct. 349, 48 L. Ed. 525; Marshall Field v. Clark, 143 U. S. 649, 12 S. Ct. 495, 36 L. Ed. 294; St. Louis, Iron Mountain & S. R. Co. v. Taylor, 210 U. S. 281, 28 S. Ct. 616, 52 L. Ed. 1061.

Attention has already been directed to the expressed purpose of Congress in the Recovery Act. I consider it unnecessary in

this memorandum to quote any further from the law to show that it contains all of the requirements of the decisions of the Supreme Court that establish the general rule just mentioned. Suffice it to say that neither the act nor the Code which was formulated by the industry itself, with the approval of the President under the act, contains any unlawful delegation of power, considering the practical aspects of the situation that confronted Congress in the petroleum industry of the United States.

In conclusion it should be stated that I have found no decision of the Supreme Court that directly prohibits the federal government from regulating crude oil production within the several states, as prescribed by the National Industrial Recovery Act and the Code of Fair Competition for the Petroleum Industry. The closest approach to an authoritative ruling by that court upon the problem before this court is found in Champlin Refining Co. v. Corporation Commission, supra, where the court recognized the right of the state of Oklahoma to regulate oil production. This decision, in my opinion, goes no farther than to hold that the Oklahoma statute involved did not burden interstate commerce. I believe it does not apply to the facts of this suit as they have been found by this court. The facts here show that the production operations of the defendant companies do interfere with the free flow of interstate and foreign commerce; and we are here directly considering federal authority under an act of Congress designed to aid interstate and foreign commerce.

The unfair and profitless competition of the producing and refining units of the oil industry in the nation during the depression, until the passage of the Recovery Act and the approval of the Petroleum Code, demonstrates the imperative necessity of nation-wide co-ordinated regulation of this mighty medium of commerce and security. It is my deliberate judgment that the remedial recovery statute will fail to accomplish its end of removing obstructions to the free flow of the stream of interstate and foreign commerce in the petroleum industry if the agencies that the act creates through the code are precluded from regulating the unique, fugitive, and basic mineral that is the genesis of all oil business.

The complainants are entitled to restrain further violations of the orders of the Administrator pendente lite; and defendants' application for temporary injunction is denied.