**SUNSHINE MINING CO. v. CARVER, U. S. Dist. Atty., et al.**

**No. 1444.**

District Court, D. Idaho, N. D.
July 1, 1940.

---

276

Joseph C. Cheney, of Yakima, Wash., and H. J. Hull, of Wallace, Idaho, for plaintiff.

John A. Carver, U. S. Dist. Atty., and E. H. Casterlin and Paul S. Boyd, Asst. U. S. Dist. Attys., all of Boise, Idaho, and Dorothy M. Williams, of San Francisco, Cal., for defendant John A. Carver.

R. Max Etter, of Spokane, Wash., and Carl M. Buell, of St. Maries, Idaho, for Wallace Local No. 14 and members, and Kellogg Local No. 18 and members.

Robert E. Brown and Eugene S. Ware, both of Kellogg, Idaho, for defendant Mine, Mill & Smelter Workers Local No. 21520 and members.

CAVANAH, District Judge.

The plaintiff is a mining company engaged in extracting ore from its mining property in Idaho.

The principal questions before the Court are presented on defendants' motion to dismiss and appear to be:

1. Is the plaintiff engaged in commerce within the meaning of the Constitution of the United States and the Fair Labor Standards Act, 29 U.S.C.A., § 201 et seq.?

2. Does the complaint state facts sufficient to constitute an actual controversy within the provision of the Declaratory Judgment Act, Jud.Code, § 274d, 28 U.S.C. A. § 400?

3. Does the Fair Labor Standards Act recognize the lunch period as a part of the maximum hours and may be deducted in computing the time an employee is working within the meaning and intent of the Act?

4. Are the defendants proper parties to the action? And, is the Administrator of the Wage and Hour Division an indispensible party?

The pertinent provision of the Fair Labor Standards Act regarding the maximum and minimum wages apply, by their terms, to employees who are "engaged in commerce or * * * production of goods for commerce," 29 U.S.C.A. § 202, and "commerce" is defined to be "trade, commerce, transportation, transmission, or communication among the several States or from any State to any place outside thereof." § 203(b).

The term "produced" means "produced, manufactured, mined, handled, or in any other manner worked on in any State," § 203(j), and the term "goods" is defined to mean "goods (including ships and marine equipment), wares, products, commodities, merchandise, or articles or subjects of commerce of any character, or any part or ingredient thereof, but does not include goods after their delivery into the actual physical possession of the ultimate consumer thereof other than the producer, manufacturer, or processor thereof." § 203(i).

With these provisions of the Act in mind, we turn to the complaint to ascertain if the facts there alleged bring the plaintiff's operations within the provisions of it, as the constitutionality of the Act is not questioned.

The intrastate and interstate character of the plaintiff's business is alleged to be that it is engaged in operating a mine in Shoshone County, and its sole and only business and activity is extracting of ore containing gold, silver, copper, lead, antimony, bismuth, zinc, arsenic and iron and the concentrating of such ore in a mill selling the concentrated ore to the Bunker Hill and Sullivan Mining and Con-

centrating Company for cash f.o.b. the cars at Shont, Shoshone County, Idaho, and such concentrated ore is thereupon taken by the buyer from Shont to its smelter at Bradley, Idaho, and after further concentration is dumped in with other ores mined by it and purchased by it from other persons, firms and corporations within and without the state of Idaho, in its ore bins or dumps and all identity of such ore is thereupon lost. That the lead is usually sold by the smelter in interstate commerce and the gold and silver is within six months sold and delivered by the smelter to the United States Government.

With these facts before us, the sole question is one of construction and application of the Act of Congress and it appears clear that the Act applies to plaintiff's employees, as Congress in describing the employees to whom the Act applies, distinguished between persons engaged in interstate commerce and those employed in producing goods for interstate commerce, both classes are covered.

The expressions "produced" and "goods" in the Act indicate that Congress intended the Act to apply to employees engaged in producing goods which are processed further or changed as to form by other persons before going into interstate commerce and the employee who produces goods which form an ingredient or part of other goods which go into interstate commerce is "engaged in the production of goods for interstate commerce".

It appears from the complaint that plaintiff's employees are engaged in producing goods, namely, ore, which after being refined or processed by the smelter goes into interstate commerce and comes within the terms of the Act. The Act reaches both those who are engaged in interstate commerce and those engaged in the production of goods for interstate commerce.

The Supreme Court in the cases of National Labor Relations Board v. Fainblatt, 306 U.S. 601, 59 S.Ct. 668, 83 L.Ed. 1014, and National Labor Relations Board v. Bradford Dyeing Association, 60 S.Ct. 918, 84 L.Ed. 1226, distinguishes between being engaged in commerce and being engaged in the production of goods for commerce, and held in the Fainblatt case, when in referring to the question there involved after holding that the Act applies to such employees, that: " * * * whether the National Labor Relations Act is applicable to employers, not themselves engaged in interstate commerce, who are engaged in a relatively small business of processing materials which are transmitted to them by the owners through the channels of interstate commerce and which after processing are distributed through those channels. * * * The end sought in the enactment of the statute was the prevention of the disturbance to interstate commerce consequent upon strikes and labor disputes induced or likely to be induced because of unfair labor practices named in the Act. That those consequences may ensue from strikes of the employees of manufacturers who are not engaged in interstate commerce where the cessation of manufacture necessarily results in the cessation of the movement of the manufactured product in interstate commerce, has been repeatedly pointed out by this Court." [306 U.S. 601, 59 S.Ct. 669, 83 L.Ed. 1014.]

The Fifth Circuit Court of Appeals in the case of Opp Cotton Mills, Inc., v. Administrator of Wage and Hour Division of Department of Labor, 111 F.2d 23, 27, when in considering this question held that the Act applies to the production of goods for Interstate Commerce as distinguished from interstate commerce itself. The Court there upheld the order fixing the minimum wage of 32½¢ an hour for employees in the textile industry and said: "In enacting the Fair Labor Standards Act of 1938 Congress sought to conserve interstate commerce and protect it from the burdens and obstructions incident to the transportation of goods produced under substandard working conditions." So when applying the alleged facts to the Act the conclusion must be reached that the plaintiff is subject to the Fair Labor Standards Act as far as it relates to being engaged in the production of goods for interstate commerce, as plaintiff's employees are engaged in the production of goods for interstate commerce within the meaning of the Act.

We now approach the second question, is there an actual controversy, as disclosed by the complaint, within the meaning of the Declaratory Judgment Act, after it is thought that the plaintiff is subject to the Act as its employees are engaged in the production of goods for interstate commerce?

Does the demand with reference to the lunch period involved in plaintiff's operation and the restraining of the defendants from instituting any action against it,

arise out of a violation of the Act? It will be remembered that the operations of the Declaratory Judgment Act are procedural only. The Fair Labor Standards Act provides for penalties to be imposed upon employers, for a violation of it, there must, of course, exist a real and substantial controversy between the parties having adverse legal interest through a decree of a conclusive character, as defined by the Supreme Court in the case of Aetna Life Insurance Company v. Haworth, 300 U.S. 227–240, 57 S.Ct. 461, 464, 81 L.Ed. 617, 108 A.L.R. 1000: "A 'controversy' in this sense must be one that is appropriate for judicial determination. Osborn v. United States Bank, 9 Wheat. 738, 819, 6 L.Ed. 204. A justifiable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot. United States v. Alaska S S Co., 253 U.S. 113, 116, 40 S.Ct. 448, 449, 64 L.Ed. 808. The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. South Spring Gold Co. v. Amador Gold Co., 145 U.S. 300, 301, 12 S.Ct. 921, 36 L.Ed. 712; Fairchild v. Hughes, 258 U.S. 126, 129, 42 S.Ct. 274, 275, 66 L.Ed. 499; Massachusetts v. Mellon, 262 U.S. 447, 487, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078. It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts."

Having in mind these principles covering the application of the Declaratory Judgment Act, what is the nature of the controversy, their relation and interest to the relief sought as disclosed by the complaint?

It appears that prior to October 24, 1938, the lunch period was not regarded by the plaintiff as a part of its maximum hours, and on October 24, 1939, the maximum hours under the Fair Labor Standards Act were reduced from 44 to 42 hours per week. 29 U.S.C.A. § 207(a) (2). To meet this condition, and knowing that on October 24, 1940, the maximum hours under the Act would be further reduced to 40 hours per week, plaintiff alleges that it "placed its operations on the basis of a five day week. That is, the regular work of all daily wage employees was limited to five shifts per week. No other change was made in working schedules. The hours worked per shift remained at seven and one-third and the number of hours regularly worked per week on the five shift basis become 36⅔. Overtime rates were paid whenever the hours worked per week exceeded 42. For instance, if an employee was worked six days or 44 hours, he was paid for two hours of the 44 at one and one-half times his regular rate. Overtime rates were also paid daily wage employees whenever their regular shift was exceeded in any one day even though the total hours worked during the week were less than 42. * * *"

"That during the past year, up to the latter part of October 1939, plaintiff employed its employees upon the basis of a 44 hour week for the time such employees were actually working. That is, plaintiff established a six day week with an eight hour day from the collar of the mine back to the collar of the mine, with 40 minutes lunch period deducted, making a total time of employees in the mine of 48 hours a week, with four hours deducted for the lunch period, making a net employment of 44 hours. That it is and was plaintiff's contention that this was in strict conformity with the 44 hour week. That some of the employees of the plaintiff, particularly those who have appointed Local 14 and Local 18 their collective bargaining agents, have contended and do contend that plaintiff's operations prior to October 24, 1939, constitute a violation of the Fair Labor Standards Act, and that the employees were entitled to four hours overtime per week and were and are soliciting assignments of claims from employees for the purpose of bringing suit, and are threatening to sue plaintiff therefor. That if any of plaintiff's employees have such a cause of action, many employees have, and between the employees now working and those who have worked during the past years there are over 600 men and possibility of 600 lawsuits. That the amount of each suit would be a comparatively small sum but in the aggregate would exceed $20,000.00 besides penalties and costs. That if plaintiff is liable for any sum whatsoever it will pay the same without suit.

"That on account of such threats and in order not to be in violation of any law applicable to plaintiff's operations, plaintiff reduced its working period to a five-day week, eight hours from collar to collar, or 40 hours within the mine with a 40 minute lunch period, making a 36⅔ hour working week. That this resulted in a loss of a

full day's time for every employee and greatly interferes with plaintiff's operations. The effect of the 5 day week is to reduce the amount of pay to each employee on the average of $6.85 a week or $356.20 a year for 52 weeks. * * *

"That plaintiff desires to return to a six-day week upon the same basis upon which it operated prior to October 1939, but on account of the penalties provided in the Fair Labor Standards Act, is afraid to do so until such time as it has been finally settled as to whether or not plaintiff is within or without the operation of such statute, and if within, whether the lunch period can or cannot be deducted from the maximum hour limitations of such Act.

"That the wage and hour Division of the Department of Labor and the Department of Justice have threatened prosecution and the imposition of penalties against every employer, including the plaintiff, such prosecution would be brought by the defendant Carver, and large numbers of plaintiff's employees have threatened to bring action under the provisions of Section 16 of the Act."

The crucial question is, does the Act and the alleged facts recognize the interpretation of them that the lunch period is a part of the maximum hours and may be deducted in computing time an employee is working? The Act in this respect provides for the maximum hours for a work-week, and does not inform us as to whether the lunch period shall be recognized as a work period, and leaves that open for determination as to whether or not an employee is working during the time he is having his lunch. To determine that issue of fact under the alleged facts which present different situations as to where and the manner in which certain of plaintiff's employees work, it will require the taking of testimony and when that is done the Court can conclude whether the lunch period shall be recognized as a work period.

■ After a consideration of the alleged facts and the Fair Labor Standard Act, and the contention of the parties, it appears clear that they present an actual substantial controversy within the meaning of the Declaratory Judgment Act, which merely affords an additional remedy to one who is not certain of his rights and desires an early adjudication without waiting until his adversary should decide to bring suit. We may not assume that in a proceeding for a declaratory judgment it may not be maintained where there is another remedy available. Stephenson et al. v. Equitable Life Assurance Society of United States, 4 Cir., 92 F.2d 406; Maryland Casualty Co. v. Consumers Finance Service, 3 Cir., 101 F.2d 514; United States Galvanizing & Plating Equipment Corporation v. Hanson-Van Winkle-Munning Co., 4 Cir., 104 F.2d 856.

Lastly, are the defendants improperly joined and is the Administrator of the Wage and Hour Division an indispensible party? It being urged by the defendants that the District Attorney for the District of Idaho has no authority under the statute to carry out a threat of prosecution. Subdivision (b) of Section 4 of the Act provides: " * * * Attorneys appointed under this section may appear for and represent the Administrator in any litigation, but all such litigation shall be subject to the direction and control of the Attorney General. * * *" And Section 11 provides that the administrator shall bring all action under Section 17 to restrain violation thereof, and it vests in the Attorney General the same power over the attorney appointed by the Administrator that he has over the District Attorneys. The Attorney General has general charge over all litigation when the United States or any of its agencies are involved. Title 5 U.S.C.A. § 309.

■ The Department of Labor Act created a Wage and Hour Division which is under the Administrator, an agency of the United States, and the duty of the District Attorney is to prosecute all delinquents for crimes and offenses cognizable under the authority of the United States, Title 28 U.S.C.A. § 485. He has control and charge of all criminal proceedings within his District. He may proceed and prosecute under the Act without first receiving authority from the Attorney General or the Administrator. A grand jury would have the power to make an inquisitorial investigation and ascertain whether or not the Act had been violated and if a true bill is returned it would become the duty of the District Attorney to prosecute without first having to receive authority from either the Attorney General or the Administrator, and he is, no doubt, a proper party under the alleged facts.

■ Referring again to Section 4 of the Act, the Administrator may at his option appoint attorneys who may represent the Administrator in "any litigation" which

he may bring under Sections 11 and 17 of the Act and all such litigation is subject to the direction and control of the Attorney General. The phrase "litigation" in the Act refers to civil actions, and not criminal proceedings. While ordinarily an injunction would not be granted against a prosecuting officer to enforce the violation of a criminal statute, but where additional procedure is now granted under the Declaratory Judgment Act, granting to the citizen the right to raise the issue as to whether their conduct does or does not violate the criminal law, and affects his property rights, he is not required to wait indefinitely under such suspension. Where there are unexecuted threats, could not the plaintiff, engaged in business, be in a position to challenge the validity of the claim of the Wage and Hour Division of the Department of Labor and the Department of Justice, that its business is conducted not in violation of law, by assuming the initiative?

Such a transfer of interpretation of statute, from criminal to a civil Court, should be approved where the plaintiff under this new additional remedy, the Declaratory Judgment Act, shows a substantial controversy existing. It is a too narrow view of the judicial functions and under the Declaratory Judgment Act to assert that the only method of trying the validity of the business practice here is to wait until the prosecution occurs.

If the threats alleged to have been made by the Wage and Hour Division of the Department of Labor and the Department of Justice and the defendant Carver, the District Attorney, being in the Department of Justice, to prosecute the plaintiff, should they not comply with the Act, and also threats made by large number of employees to bring action under the provisions of the Act, then the plaintiff would be subject to prosecution at any moment when such agencies of the United States decide to proceed and it would not have to wait under the interpretation here given to the Declaratory Judgment Act, until some criminal prosecution is instituted before it could have determined the issue presented.

It will be observed that the Declaratory Judgment Act does not contain a requirement making all persons parties who have or claim any interest which would be affected by the Declaratory Judgment.

The only question with reference to parties to a Declaratory Judgment action is whether a party is made defendant, between whom and the plaintiff, a controversy or cause exists. Under such circumstances the Court has jurisdiction of that controversy without regard to the number of other parties who might have been joined and a declaratory judgment would apply and bind those included as defendants, and the Attorney General and the Wage and Hour Administrator are not indispensible parties to the determination of the controversy between the plaintiff and defendant employees and Unions. It is apparent that as far as the defendants, employees and Unions, are concerned, or the determination of the controversy between them and the plaintiff is concerned, it is in no wise dependent or has any connection with the Attorney General or the Wage and Hour Administrator. The issue between them is clear-cut and would be the same which would exist between them should these defendants sue the plaintiff for penalties and overtime, and therefore it would not be necessary to bring in the Attorney General and the Wage and Hour Administrator as parties. Neither of them have any material, legal, equitable interest in the action as far as the controversy between these parties is concerned, and the granting of the relief against the employee defendants does not effect anyone not made a party to the action. Complete relief can be given as between those already parties, and the question of the indispensibility of those not made parties can arise only when relief cannot be completely afforded between the parties already joined in the controversy.

The equitable relief prayed for here is purely ancillary to the granting of declaratory relief. If it should be determined that the plaintiff is not subject to the Act as far as the lunch hour period is concerned, it certainly would be proper to restrain defendants from instituting any civil or criminal action against it. It is threatened with the bringing of a large number of suits under the Fair Labor Standards Act for the purpose of collecting the controverted overtime penalties. Unless jurisdiction is assumed and the declaratory relief prayed for is granted, the plaintiff would have no recourse of determining its liability. The need and propriety of equitable relief is obvious. Any other remedy is not adequate "if its adequacy depends upon the will of the opposing party." American Life Insurance Co. v.

Stewart, 300 U.S. 203, 57 S.Ct. 377, 380, 81 L.Ed. 605, 111 A.L.R. 1268.

The Supreme Court in the case of Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 246, 79 L.Ed. 446 said: "The statute provides that any violation of any order of the President issued under section 9(c) [15 U.S.C.A. § 709(c)] shall be punishable by fine of not to exceed $1,000, or imprisonment for not to exceed six months, or both. We think that these penalties would attach to each violation, and in this view the plaintiffs were entitled to invoke the equitable jurisdiction to restrain enforcement, if the statute and the executive orders were found to be invalid." And also it was held in the cases of Berdie v. Kurtz, 9 Cir., 75 F.2d 898, and Darger v. Hill, 9 Cir., 76 F.2d 198, where they were based upon the possibility of innumerable prosecutions, that the Secretary of Agriculture was not an indispensible party. That possibility is present here as plaintiff is subject to repeated penalties in carrying on its business which would entitle it to invoke equitable jurisdiction to restrain the enforcement of the Act which, if found, does not comply to it as far as including the lunch hour in the maximum hours.

As said, the complaint discloses that the defendants threaten to enforce criminal penalties of the Fair Labor Standards Act, and the hazards from the multiplicity of prosecutions and the irreparable injury, to its business activities. I can see no escape from the conclusion that equitable grounds here are ample for the relief prayed for, if established by proof as stated, and the motions to dismiss are overruled.