## DIVINE v. LEVY et al.
### No. 365.

District Court, W. D. Louisiana, Shreveport Division.

May 22, 1941.

LeRoy Smallenberger, of Shreveport, La., for plaintiff.

Blanchard, Goldstein, Walker & O'Quin, of Shreveport, La., for defendants Ben Levy and A. Goldstein.

Edward S. Klein, and Wilkinson, Lewis & Wilkinson, all of Shreveport, La., for Jay Weil and Harry Weil.

Gerard D. Reilly, Sol., and Irving J. Levy, Asst. Sol., both of Washington, D. C., Jerome A. Cooper, Acting Regional Atty., of Birmingham, Ala., and D. Douglas Howard, Associate Atty., of New Orleans, La., amici curiae.

PORTERIE, District Judge.

This is the second time we have had this case for consideration. See 36 F.Supp. 55.

The point to be decided now is whether or not the plaintiff was "engaged in commerce or in the production of goods for commerce." Fair Labor Standards Act of 1938, Sec. 6(a), C. 676, 52 Stat. 1062, 29 U.S.C.A. § 206(a). The issue arises under a motion for summary judgment.

The plaintiff was a common laborer employed in the erection of the drilling rigs for, and then who continued to work as a roughneck in, the exploitation and ensuing production of oil for the defendants, the owners of two small leases upon which several wells had been developed whose total production was slight and was obtained only by the use of mechanical pumps. The oil was continuously produced for sale at the wells or in the vicinity of the wells to any person or persons who might be willing to buy. During the period of the employment of plaintiff practically all of the oil from these wells was sold to the Standard Oil Co. of Louisiana, the sale being made in Caddo parish, the oil being delivered in Caddo parish, and payment for the oil being made in Caddo parish, Louisiana. The managing owner stated he did not know and did not inquire as to what disposition the Standard Oil Co. of Louisiana made of the oil, although he had heard and believed that it was taken by the Standard Oil Co. of Louisiana, over the lines of the Standard Oil Pipe Line Co., to its refinery at Baton Rouge, Louisiana, and there converted into various refined products, mainly gasoline.

The facts are not disputed; the inference to be made from the facts is difficult, in view of the language of the statute above quoted and of the relatively few cases directly on the statute because of its comparatively late enactment, and because of the great number of cases under federal statutes similar or analogous to the instant one having to be considered because of their persuasive value.

The plaintiff contends that because the refinery of the Standard Oil Co. of Louisiana at Baton Rouge sells a large proportion

of its products in interstate commerce, it follows that the extraction from the ground of the crude oil by the defendants was the production of goods for commerce. The defendants contend that the sale of crude oil is one thing and the sale of refined products from that crude oil is quite another thing; and that, as is the case here, when oil is produced by small independent operators and sold on the spot at an agreed price, the transaction is one which is complete in itself and which is entitled to be classified without regard to subsequent activities of the purchaser in the way of transporting the oil, manufacturing various refined products from it, and finally selling and delivering the refined products out of state.

Defendants' contention is well and forcefully presented by the following quotation from their counsel's brief: "The production of oil was the activity in which the plaintiff was engaged. That production ceased when the oil was placed in the defendants' tanks. This was a closed transaction. Then followed another transaction: The sale of the oil to the Standard Oil Company of Louisiana. This likewise was a closed transaction, the oil being delivered in Caddo Parish and paid for in Caddo Parish. Then followed another transaction: The transportation of the oil by the Standard Oil Company of Louisiana in its own line from Caddo Parish to Baton Rouge, Louisiana. Then followed another transaction: The manufacture of the crude oil into refined products. All of these transactions taken separately or together are purely intrastate in character; and it is not until we reach the point where the refinery begins to sell and move the refined products that we touch interstate commerce."

To discern the intent of Congress in relation to the facts of the instant case we quote the pertinent definitions in the Act and one of its sections:

"Commerce" is defined in Section 3(b) 29 U.S.C.A. § 203(b) as meaning "trade, commerce, transportation, transmission, or communication among the several States or from any State to any place outside thereof."

"Produced" is defined in Section 3(j) as follows: " 'Produced' means produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purposes of this Act [chapter] an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any process or occupation necessary to the production thereof, in any State."

Section 3(i) defines "goods" as follows: " 'Goods' means goods (including ships and marine equipment), wares, products, commodities, merchandise, or articles or subjects of commerce of any character, *or any part or ingredient thereof,* but does not include goods after their delivery into the actual physical possession of the ultimate consumer thereof other than a producer, manufacturer, or processor thereof." (Italics supplied)

Section 6(a) provides: "Every employer shall pay to each of his employees who is engaged in commerce or in the production of goods for commerce wages at the following rates— * * *."

■ The plaintiff-laborer was engaged in producing crude oil, which is the raw material from which gasoline and other products are refined at the Baton Rouge refinery of the Standard Oil Company. He was clearly engaged in the production of "goods" within the meaning of the Act. Since a substantial portion of the products of the refinery is shipped in interstate commerce, it follows that the plaintiff-laborer was engaged in the production of goods "for commerce." Cases of the United States Supreme Court, to which we shall refer later, speak of the "free flow of commerce" which is here represented by what is a well-defined movement of "goods" from the wells in Louisiana to markets in other states. The oil produced by the defendants and their employee contributed to that stream and became an inseparable part of it.

■ The fact that the defendants, owning and operating the lease and actually producing the oil, sold it, when so produced, to the Standard Oil Company, which in turn delivered it for carriage to the pipe line company that gathered and transported it to the Baton Rouge refinery, however intrastate that transaction might be, does not affect the question. Sunshine Mining Co. v. Carver, D.C.Idaho, 34 F.Supp. 274; Fleming v. Enterprise Box Co., D.C. Florida, 37 F.Supp. 331; United States v. Darby Lumber Co., 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. ——; N. L. R. B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, '57

S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; Santa Cruz Packing Co. v. Labor Board, 303 U.S. 453, 58 S.Ct. 656, 82 L.Ed. 954; Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263; United States v. Wilshire Oil Co., D.C. Cal., 9 F.Supp. 396; National Labor Relations Board v. Sunshine Mining Co., 9 Cir., 110 F.2d 780; Consolidated Edison Co. v. N. L. R. B., 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126; N. L. R. B. v. Fainblatt, 306 U.S. 601, 59 S.Ct. 668, 83 L.Ed. 1014; Wood v. Central Sand & Gravel Co., D.C., 33 F.Supp. 40.

"The crude oil or 'parts or ingredients' of it as commerce passed beyond our State lines" is the language of Judge Wilson in the recent and nearly identical case of R. F. St. John et al. v. H. H. Brown, et al., D.C.N.D. Texas, 38 F.Supp. 385, decided March 28, 1941.

▀ The monetary issue between the plaintiff and the defendants herein exists because of the overtime hours the laborer gave. Approximatively, his average salary paid under the contract was $61 per month; under the minimum wage and maximum hours, as fixed by the Act, for the first year he would have earned $44 per month; however, it is alleged that he actually put in 124 overtime hours per week which, at 37½¢ under the Act, would give him $46.-50 per week, or $186 per month, for his overtime. Legally and strictly, the fact of giving this man so little for so much time has nothing to do with the case. Nevertheless, when we read the Congressional finding and declaration of policy of the Act (29 U.S.C.A. § 202)—particularly (a) thereof: "The Congress hereby finds that the existence, in industries engaged in commerce or in the production of goods for commerce, of labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers (1) causes commerce and the channels and instrumentalities of commerce to be used to spread and perpetuate such labor conditions among the workers of the several States; (2) burdens commerce and the free flow of goods in commerce; (3) constitutes an unfair method of competition in commerce; * * *."—the court is impelled to sense the "hospitable scope" of the Act as a whole. See United States v. Hutcheson et al., 61 S.Ct. 463, 85 L.Ed.——. Consequently, in the interpretation of whether or not a factual situation brings about interstate commerce under this Act we should be liberal rather than strict.

The purpose of the Act would be frustrated if the courts were to limit its beneficence to labor by technical interpretations. It would be technical in the instant case to say that the free flow of commerce would not be obstructed because there is a change in the ownership of the oil or because the finished product, the derivative of the crude oil, is the only thing that actually crosses the state line. In truth, in that finished product which crosses the state line there is the "ingredient" of the crude oil that this laborer helped to extract from the ground.

One of the counsel in support of the motion for a summary judgment stresses the case of Carter v. Carter Coal Co., 298 U.S. 238, 56 S.Ct. 855, 869, 80 L.Ed. 1160, making the following quite ample quotation:

"In Oliver Iron Co. v. Lord, 262 U.S. 172, 178, 43 S.Ct. 526, 529, 67 L.Ed. 929, we said on the authority of numerous cited cases: 'Mining is not interstate commerce, but like manufacturing, is a local business, subject to local regulation and taxation. * * * Its character in this regard is intrinsic, is not affected by the intended use or disposal of the product, is not controlled by contractual engagements, and persists even though the business be conducted in close connection with interstate commerce.'

"The same rule applies to the production of oil. 'Such production is essentially a mining operation, and therefore is not a part of interstate commerce, even though the product obtained is intended to be and in fact is immediately shipped in such commerce.' Champlin Refining Co. v. Corporation Commission, 286 U.S. 210, 235, 52 S.Ct. 559, 565, 76 L.Ed. 1062, 86 A.L.R. 403. One who produces or manufactures a commodity, subsequently sold and shipped by him in interstate commerce, whether such sale and shipment were originally intended or not, has engaged in two distinct and separate activities. So far as he produces or manufactures a commodity, his business is purely local. So far as he sells and ships, or contracts to sell and ship, the commodity to customers in another state, he engages in interstate commerce. In respect of the former, he is subject only to regulation by the state; in respect of the latter, to regulation only by the federal government. Utah Power & L. Co. v. Pfost, 286 U.S. 165, 182, 52 S.Ct. 548,

76 L.Ed. 1038. Production is not commerce; but a step in preparation for commerce. Chassaniol v. Greenwood, 291 U.S. 584, 587, 54 S.Ct. 541, 78 L.Ed. 1004."

Though the Carter case came from the Supreme Court of the United States as late as May, 1936, the subsequent trend of cases, particularly that of the fully-elaborated case of National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352, has sapped it of all its authority. Chief Justice Hughes in the Jones-Laughlin opinion had the following to say of the Carter case: "It is thus apparent that the fact that the employees here concerned were engaged in production is not determinative. The question remains as to the effect upon interstate commerce of the labor practice involved. In the Schechter Case, supra [Schechter Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947], we found that the effect there was so remote as to be beyond the federal power. To find 'immediacy or directness' there was to find it 'almost everywhere,' a result inconsistent with the maintenance of our federal system. In the Carter Case, supra, the Court was of the opinion that the provisions of the statute relating to production were invalid upon several grounds,—that there was improper delegation of legislative power, and that the requirements not only went beyond any sustainable measure of protection of interstate commerce but were also inconsistent with due process. These cases are not controlling here." 57 S.Ct. at page 626.

The holding of the Carter case is summarized by Justice McReynolds, in his dissent in the Laughlin case, as follows: " * * * And, in Carter's Case, we held Congress lacked power to regulate labor relations in respect of commodities before interstate commerce has begun." 57 S.Ct. at page 640.

We believe that interstate commerce has begun in this case when the crude oil, through the effort of plaintiff-laborer, first moved in the pores of the restraining sand stratum. Under the doctrine of the Carter case, there would be no movement in interstate commerce until the manufactured products made from the crude oil began to move. All the laborers concerned with the crude oil to that time would be left out of the beneficent ambit of the Act, with the necessary resultant negation of the declared Congressional policy. "Although activities may be intrastate in character when separately considered, if they have such a close and substantial relation to interstate commerce that their control is essential or appropriate to protect that commerce from burdens and obstructions, Congress cannot be denied the power to exercise that control." National Labor Relations Board v. Jones & Laughlin, supra, 57 S.Ct. at page 624; see also Houston, E. & W. T. R. Co. v. United States (Shreveport Case), 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341.

We are not the first of this view, in giving greater amplitude to the compass of transactions forming a part of and being called interstate commerce, for the Circuit Court of Appeals, 9th Circuit, on April 3, 1940, in the case of National Labor Relations Board v. Sunshine Mining Co., 110 F.2d 780 (certiorari denied 312 U.S. 678, 61 S.Ct. 447, 85 L.Ed. ——, rehearing denied 61 S.Ct. 619, 85 L.Ed. ——) said substantially (quoting from the headnote which we consider very accurate) the following: "Where mining company sold all its products within the state to a smelting company also within the state, and the finished products of smelting company were shipped to other states, the arrangement between the companies did not change the essential fact that the transactions together constituted a direct and continuous flow of commerce across state lines."

Shortly after the decision in the above case, on July 1, 1940, in the case of Sunshine Mining Co. v. Carver, D.C., 34 F. Supp. 274, involving the same mining company and consequently having the same factual background, the decision was as follows (the first headnote, being an accurate digest of the point in the opinion affecting the question of whether there was interstate commerce or not, is quoted): "A mining company which extracted ore containing minerals, and which sold the ore to a company which mixed the ore with other ore and smelted it and usually sold the minerals in interstate commerce and to the federal government, was subject to the Fair Labor Standards Act [29 U.S.C.A. § 201 et seq.] making the act applicable to employees who are engaged in commerce, or 'production' of goods for commerce among the states, since the mining company was engaged in the 'production' of goods for interstate commerce."

These two decisions make a full comparative study of all the cases we have cited herein, particularly of the Jones & Laughlin case, and as they involve practically the same facts as we have in this case except that ours is the exploitation for crude oil from the ground and the Sunshine Mining case is the extraction of ore containing minerals from the ground—so analogous for any and all practical purposes as to be taken as identical—there is nothing new to decide.

The testimony taken on the trial of this motion shows preponderantly that an amount is due plaintiff under the Act, above what he has been paid. Fixing that amount will be the next object in the trial of this case.

Summary judgments as prayed for are denied.